# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
|     *Plaintiff,* | ) | |
| | ) | |
| v. | ) | CASE NO. _____ |
| | ) | |
| COLONY RIDGE, INC.; COLONY | ) | |
| RIDGE DEVELOPMENT, LLC; | ) | |
| COLONY RIDGE BV, LLC; COLONY | ) | |
| RIDGE LAND, LLC; T-REX | ) | |
| MANAGEMENT, INC.; JOHN HARRIS; | ) | |
| and HOUSTON EL NORTE PROPERTY | ) | |
| OWNERS' ASSOCIATION, INC., | ) | |
|     *Defendants.* | ) | JURY TRIAL DEMANDED |
| | ) | |

## COMPLAINT

Plaintiff, STATE OF TEXAS (the "State"), acting by and through the Attorney General of Texas, Ken Paxton, brings this action against Defendants COLONY RIDGE, INC.; COLONY RIDGE DEVELOPMENT, LLC; COLONY RIDGE BV, LLC; COLONY RIDGE LAND, LLC; T-REX MANAGEMENT, INC.; JOHN HARRIS; and HOUSTON EL NORTE PROPERTY OWNERS ASSOCIATION, INC. (collectively, "Defendants") for violating the Texas Deceptive Trade Practices─Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41–17.63; Tex. Bus. & Com. Code § 27.01, Fraud in Real Estate Transactions; the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5552(a), 5536; and the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. §§ 1701-1720.

## INTRODUCTION

1.      Colony Ridge, Inc. (CRI), Colony Ridge Development, LLC (CR Development), Colony Ridge BV, LLC (CR Bella Vista), Colony Ridge Land, LLC (CR Land), T-Rex Management, Inc. (T-Rex), (collectively, "Colony Ridge") and their owner, John Harris, have built a sprawling community northeast of Houston on a foundation of false, misleading, and deceptive sales, marketing, and lending practices. Colony Ridge's business model is predicated on churning land purchasers through a foreclosure mill. Namely, Colony Ridge targets foreign born and Hispanic consumers with limited or no access to credit with promises of cheap, ready to build land and financing without proof of income. And Colony Ridge lies in a multitude of ways about the conditions that those buyers will experience on the property. Many of those conditions, once discovered, preclude the buyer from actually making any practical use of the land. The result is that the buyer, having discovered that they cannot meaningfully use the land, defaults on the land financing at jaw-dropping rates. Colony Ridge then forecloses on the buyer, re-possesses the land having lost nothing, and then turns around and sells the same land *again* to another unsuspecting buyer with the same deceptive set of misrepresentations. At best, consumers struggle with unexpected financial burdens for years to avoid foreclosure, to the benefit of Colony Ridge and its pernicious business model.

2.      Indeed, the proof of Colony Ridge's scheme is in the pudding. On October 31, 2023, a Colony Ridge representative testified before the Texas Senate that CR Land's foreclosure rate is 12%. This alarming figure is roughly ***50 times greater than the 2023 nationwide foreclosure rate of 0.26%*** (roughly 1 in every 400 homes were foreclosed in the United States in 2023).[1] Even in 2009, at the height of the U.S. housing crisis, the foreclosure rate was only 2.22%

---

[1] *See U.S. Foreclosure Activity Increases From 2022 But Still Below Pre-Pandemic Levels*, ATTOM (Jan. 11, 2024), https://www.attomdata.com/news/market-trends/foreclosures/attom-2023-year-end-u-s-foreclosure-market-report/.

nationwide (roughly 1 in every 45 homes were foreclosed).[2] On information and belief, Colony Ridge's profitability rests in no small part on the one-two-punch of its systemic deceptions coupled with this foreclosure operation.

3.      Colony Ridge's scheme begins with aggressively targeting Spanish speakers, including a significant share from international communities. Former employees state that Colony Ridge instructed them to avoid consumers who can speak English or do not appear to be of Latino or Hispanic heritage. Colony Ridge's main sales website, terrenoshouston.com, is primarily in Spanish. And as explained *infra* at ¶¶ 28, 37, 60-64, this deliberate focus on Spanish-speakers and foreign residents facilitates Colony Ridge's ability to deceive buyers with English-only paperwork.

4.      The next layer of Colony Ridge's scheme involves digital marketing employees, armed with multiple telephone SIM cards, creating social media accounts using "burner" telephone numbers. Colony Ridge directs these employees to use fake names and photographs of homes found through Google image searches to deceive unsuspecting consumers into believing that they are communicating with an individual homeowner in a "for sale by owner" transaction. Colony Ridge's digital marketing employees are directed to obtain consumers' contact information through these fake social media accounts, which are then provided to Colony Ridge's telemarketing team for consumer outreach and telemarketing purposes. The digital marketing employees are directed to pretend to "list" homes and/or lots around the Greater Houston area to cast a wider net of potential consumers. In addition, Colony Ridge provides digital marketing employees with dozens of SIM cards to bypass limitations on the amount of social media accounts

---

[2] *See U.S. 2009 foreclosures shatter record despite aid*, Reuters (Jan. 14, 2010), https://www.reuters.com/article/idUSTRE60D0LZ/.

associated to a single user; thus, allowing digital marketing employees to utilize multiple fake social media accounts to lure potential consumers.

5. Then, when Colony Ridge markets its *own* properties, it falsely represents that all lots in Colony Ridge are "move in ready" and have access to all "city services," specifically including sewer, water, and electricity. Colony Ridge assures wary consumers that, at most, they will only have to pay a few hundred dollars to the utility provider to set up an account. But as many Colony Ridge consumers later discover, the properties are not "move in ready" and instead the consumer must often wait months, sometimes years, before they can obtain city services and occupy the lot. Further, if any utility infrastructure exists at all, many of the properties require thousands of dollars in improvements, if not tens-of-thousands. Buyers are literally required to install such things as transformers or light poles before they are even allowed to occupy the land they purchased.

6. Colony Ridge also conceals other material facts about the poor living conditions in the development. For example, even though there have been two suits filed against one or more Defendants related to the severe flooding that occurs at the Development, Colony Ridge and John Harris continue to falsely represent to consumers at the time of sale that the residential lots in the Development are not subject to repeated flooding. Colony Ridge and John Harris also fail to inform consumers at the time of sale that the Development does not contain the infrastructure necessary to support the estimated 40,000 to 50,000 residents who currently reside in the Development.

7. After Colony Ridge sells property to buyers, it further enriches itself by imposing mandatory membership dues in its affiliated Property Owners Association (POA). Namely, Colony Ridge requires buyers to join a POA and imposes mandatory yearly dues of approximately $120 per member. However, contrary to how legitimate property owners associations operate, Colony

Ridge fails to spend the millions in collected POA dues to improve or benefit consumers' neighborhoods. Indeed, Defendants do nothing to enhance the welfare of its dues-paying members, some of whom live amongst neglected trash heaps, on empty lots, in ramshackle or improvised dwellings.

8.      All of this deceit and misconduct earns Colony Ridge massive profits because of the unique combination of the seller-only financing offered by Colony Ridge coupled with its foreclosure practices.

9.      *First,* CR Land offers seller-financed loans to consumers for the lots it sells and then operates as the mortgage servicing company on the resulting loans. Colony Ridge is the exclusive (or near exclusive) provider of loans and mortgage service for all lots under its control. And CR Land's financing is available only at extraordinarily high rates. Specifically, CR Land offers 20-year loans with a 12.9% interest rate coupled with only a *minimal* down payment (typically $500 or less). In his October 31, 2023 testimony before the Texas Senate, the Chief Financial Officer for CR Land, Craig Parker, testified that CR Land's financing terms are based on a "loan-to-value" ratio.[3] Under these terms, for example, a typical consumer would end up paying $85,461.98 for a lot of land that is presumably worth $30,900.

---

[3] A loan-to-value ratio is a measure comparing the amount of a mortgage with the appraised value of the property. The higher a down payment, the lower the loan-to-value. Most mortgage lenders use a loan-to-value ratio in deciding whether to lend to a borrower and to determine if they will require private mortgage insurance.

## Mortgage and Loan Analysis

Analysis

| | |
|---|---|
| Sales Price | $30,900.00 |
| Down Payment | $320.00 |
| Amount Financed | $30,580.00 |
| Annual interest (e.g., 8.25) | 12.900 |
| Duration of loan (in years) | 20 |
| Start date of loan | July 1, 2020 |
| | |
| Monthly payments | 356.09 |
| Total number of payments | 240 |
| Yearly principal + interest | 4,273.10 |
| | |
| Principal amount | 30,580.00 |
| Finance charges | 54,881.98 |
| Total cost | 85,461.98 |

initials _____ initials _____

*To display each month's calculations, extend the table by select-
ing the bottom row of data and filling down to row* **259**

10.     CR Land does not evaluate consumers' credit history, financial profile, disposable income, or pre-existing financial obligations when determining whether a consumer's loan application should be approved. And so, predictably, many consumers default. That would harm ordinary lenders, who typically incur a loss when a buyer defaults and they are forced to foreclose on a residential property. But not so with Colony Ridge. Unlike traditional mortgage lenders, Colony Ridge profits from the high number of foreclosures. On information and belief, CR Land routinely repurchases the lots in foreclosure and resells them at ***higher prices***. In fact, CR Land often resells a foreclosed lot to the ***very same consumer*** at a significantly higher price. The more foreclosures CR Land initiates, the higher likelihood it will acquire residential lots with free improvements which make the foreclosures profitable. Thus, Colony Ridge's business model incentivizes foreclosures.

11.     The Attorney General brings this action to penalize and put an end to Colony Ridge's deceptive business model.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28

U.S.C. § 1331, and is brought by the State in a "district court of the United States in that State . . . to enforce provisions of the" CFPA. 12 U.S.C. § 5552(a)(1).

13.     This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

14.     Venue is proper in this district because Defendants are located, reside, and/or do business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

## PARTIES

15.     The **Office of the Attorney General of Texas** (OAG) is authorized to bring this action to prevent deceptive acts or practices under 12 U.S.C. § 5552(a), which authorizes the State to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for Defendants' acts or practices that violate the CFPA. The State also brings this action pursuant to 12 U.S.C. § 5536(a)(1)(A), which authorizes the State to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for Defendants' acts or practices that violate other federal consumer financial laws set forth in the CFPA. In addition, the State brings this action pursuant to the authority granted to it by § 17.47 of the DTPA, § 17.41, *et seq.*, and § 27.015 of the Texas Business & Commerce Code upon the ground that Defendants have engaged in false, deceptive, and misleading acts and practices in the course of trade and commerce as defined in, and declared unlawful by §§ 17.46(a) and (b) of the DTPA and § 27.01 of the Texas Business & Commerce Code.

16.     **Defendant Colony Ridge, Inc.** is a Texas corporation which regularly conducts business in Montgomery County, Texas. CRI's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant may be served

with process by serving its registered agent, CH&P Management, LLC, at 1712 N. Frazier St., Suite 215, Conroe, TX 77301, or wherever they may be found. Formed in 2018, CRI is owned by John Harris, William Harris, Kevin Harris, Robin Lane, and Heath Marek. CRI owns 100% of Colony Ridge Development, LLC; Colony Ridge BV, LLC; Colony Ridge Land, LLC; and other CRI subsidiaries.[4] The CRI entities operate in concert to purchase, develop, sell, and maintain the Colony Ridge Development.

17.     **Defendant Colony Ridge Development, LLC d/b/a Terrenos Houston** is a Texas Limited Liability Company which regularly conducts business in Montgomery County, Texas. CR Development's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant may be served with process by serving its registered agent, CH&P Management, LLC, at 1712 N. Frazier St., Suite 215, Conroe, TX 77301, or wherever they may be found. CR Development develops infrastructure and sells lots for the following five (5) Colony Ridge Development subdivisions: Santa Fe; Rancho San Vicente; Camino Real; Montebello; and Grand San Jacinto (all Liberty County developments excluding Bella Vista).

18.     **Defendant Colony Ridge BV, LLC** is a Texas Limited Liability Company which regularly conducted business in Montgomery County, Texas. CR Bella Vista's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant may be served with process by serving its registered agent, CH&P Management, LLC, at 1712 N. Frazier St., Suite 215, Conroe, TX 77301, or wherever they may

---

[4] The following entities are subsidiaries of Colony Ridge, Inc.: T-Rex Management, Inc.; Colony Ridge Development, LLC; Colony Ridge Land, LLC; Colony Ridge Investments, LLC; Colony Ridge BV, LLC; CR Farms, LLC; Liberty Paving, LLC; Colony Ridge Tracts, LLC; Liberty Water Holdings, LLC; Duke Vacation, LLC; Casas Houston, LLC; and Liberty County Utilities, LLC.

be found. CR Bella Vista developed infrastructure and sold lots for Colony Ridge's Bella Vista subdivision. Colony Ridge completed development and sold all lots in this subdivision as of 2022.

19.     **Defendant Colony Ridge Land, LLC** is a Texas Limited Liability Company which regularly conducts business in Montgomery County, Texas. CR Land's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant may be served with process by serving its registered agent, CH&P Management, LLC, at 1712 N. Frazier St., Suite 215, Conroe, TX 77301, or wherever they may be found. CR Land serves as the lender and mortgage servicing company for the residential lots sold by Colony Ridge Development, LLC and Colony Ridge BV, LLC. CR Land also reacquires lots from foreclosure and transfers them to CR Development for resale.

20.     **Defendant T-Rex Management, Inc.** is a Texas corporation which regularly conducts business in Montgomery County, Texas. T-Rex's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant may be served with process by serving its registered agent, CH&P Management, LLC, at 1712 N. Frazier St., Suite 215, Conroe, TX 77301, or wherever they may be found. T-Rex manages and collects management fees from all CRI subsidiaries, including, but not limited to, Colony Ridge Development, LLC; Colony Ridge BV, LLC; and Colony Ridge Land, LLC. T-Rex pays and employs all the individuals that work for Colony Ridge Development, LLC; Colony Ridge Land, LLC; Colony Ridge Investments, LLC; and Colony Ridge BV, LLC.[5]

21.     **Defendant John Harris** is an individual who is named as a defendant in his individual capacity, in his capacity as a manager or director in one or more Colony Ridge entities

---

[5] The funding for T-Rex to make any such payments comes from Colony Ridge Land, LLC.

and doing business under various business names detailed above. Mr. Harris may be served at his residential address: 10653 Meachen Rd., Conroe, TX 77302, or wherever he may be found.

22.     Because of his role in owning, controlling, managing, and operating Colony Ridge and because he is the primary officer conducting business on behalf of T-Rex (which manages the various LLCs), John Harris is personally responsible and liable for a range of false, misleading, and deceptive acts and practices. John Harris directs Colony Ridge employees to enter into unlawful Land Purchase Agreements and to use unlawful deeds. Further, John Harris routinely signs consumers sales contracts.

23.     **Defendant Houston El Norte Property Owners Association, Inc.** ("El Norte POA") is a Texas corporation which regularly conducts business in Montgomery County, Texas. El Norte POA's principal place of business is located at P.O. Box 1920, Conroe, TX 77305, where they may be reached. Defendant may be served with process by serving its registered agent, CH&P Management, LLC, at 1712 N. Frazier St., Suite 215, Conroe, TX 77301, or wherever they may be found. El Norte POA has replaced several subdivision-specific POAs including, as applicable, the now voluntarily terminated nonprofit POAs known as: Liberty Montebello Property Owners Association, Inc. (formed in 2011); Liberty Bella Vista Property Owners Association, Inc. (formed in 2012); Rancho San Vicente Property Owner's Association, Inc. (formed in 2013); Grand San Jacinto Property Owner's Association, Inc. (formed in 2013); and Camino Real Property Owner's Association, Inc. (formed in 2015).

24.     Defendant John Harris has always been the President, Chairperson, and member of the Boards of Directors of El Norte POA and all the subdivision specific POAs. John Harris is also the President of Defendant T-Rex, which manages Defendants CR Development and CR Bella Vista. As the declarants to Defendant El Norte POA's governing documents, Defendants John

Harris, T-Rex, CR Development, and CR Bella Vista have governed, operated, and directed all activities of all of the Colony Ridge subdivisions' POAs, including all marketing of El Norte POA. This marketing includes POA-related materials posted on Colonyridge.com, which has been copyrighted to Defendant CR Land. As such, Defendant John Harris has always had practical control over the Defendants that operated the POAs, which, in turn, designated Defendant John Harris to govern and run the POAs and their marketing materials.

## FACTS

### A. BACKGROUND

25. Beginning in 2011 on marshy land previously used as timber farms, Colony Ridge started with a single subdivision. Individuals can purchase individual lots to build their dream home, or multiple lots for larger space or commercial use. The development boasts half an acre or larger lots and markets primarily to Spanish speaking individuals.

26. Since approximately 2016, Colony Ridge's growth has been exponential. Growing from a single subdivision, Colony Ridge now sprawls over 33,000 acres of land (over 50 square miles) in northwest Liberty County and approximately 40,000-50,000 residents call the development home. (By comparison, the nearby community of The Woodlands, Texas, commenced in 1974 and home to over 100,000 residents, is only 43.9 square miles.) The vast size and rapid growth of the development has led to shortages in policing, schools, and animal control. The entire Colony Ridge Development currently consists of the following six (6) subdivisions: Bella Vista; Santa Fe; Rancho San Vicente; Camino Real; Montebello; and Grand San Jacinto (the "Colony Ridge Neighborhoods," "Colony Ridge Subdivisions," "Colony Ridge Development" or "Development").

27.     Colony Ridge promotes its development, in part, by engaging in a deceptive marketing scheme based on harvesting users contact information by advertising lots for sale under the guise of "for sale by owner" individual transactions. Once they obtain the consumers' contact information, telemarketers relentlessly contact consumers about land for sale in the Colony Ridge development. Colony Ridge misleads consumers by marketing these lots as "move in ready" and complete with all "city services" available, without disclosing that hundreds, if not thousands, of dollars in infrastructure improvements are necessary to move onto the lot.

28.     Colony Ridge targets primarily Spanish speaking individuals and those who would not ordinarily qualify for standard mortgage financing. Colony Ridge engages in high pressure sales tactics to convince the consumers to purchase a lot. Once at closing, even though Colony Ridge conducts the entire sales process in Spanish, consumers are rushed through English-only paperwork and provided with inadequate descriptions of the contract terms. Colony Ridge intentionally fails to disclose material terms of the contract in order to induce the consumers into signing the agreement. John Harris signs virtually all Land Purchase Agreements and deeds, as is shown in the following example.

Grantor:

COLONY RIDGE DEVELOPMENT, LLC, a Texas Limited Liability Company by its Manager, T-REX MANAGEMENT, INC., a Texas Corporation

_____

JOHN HARRIS, PRESIDENT

29.     After the consumers have purchased the lot, El Norte POA, a mandatory property owners association, compels consumers to pay dues and fines at the threat of foreclosure without offering meaningful services to the residents of Colony Ridge.

30.     As previewed *supra*, Colony Ridge employs a multi-faceted set of schemes to mislead buyers and to profit from them. The various components of those schemes are set forth in detail in the following sub-sections.

## B.     DEFENDANTS' DECEPTIVE SOCIAL MEDIA ACCOUNT SCHEME

31.     First, in an attempt to gain consumer information to lure consumers into transactions, Colony Ridge's digital sales marketing employees, at the direction of Colony Ridge and John Harris, create hundreds of fake social media accounts to interact with potential consumers. The fake accounts advertise individual lots around the Greater Houston area, attempting to create the image of a for-sale-by-owner structure. Once a consumer inquires about a lot online, Colony Ridge employees obtain the consumer's contact information and provide it to Colony Ridge's telemarketing department without the consumer's knowledge or consent.

32.     Former employees report that they were hired by Colony Ridge to create fake individual accounts on social media, falsely posing as legitimate sellers of land. Colony Ridge intentionally facilitates the creation and use of multiple fake social media accounts by providing each employee with SIM cards linked to different telephone numbers to avoid detection by social media platforms. That fraudulent behavior is necessary because many social media platforms limit the number of accounts associated with one phone number and using multiple SIM cards enables a single user to run a multitude of accounts from a single device.[6]

---

[6] For example, Facebook Community Standards limit each user to one Personal Account. Accounts are linked to phone numbers. SIM cards can be used to utilize multiple phone numbers on a single device, therefore enabling use of multiple Facebook accounts. *See* Facebook Policies and Reporting, About our Policies (2023), https://www.facebook.com/help/1735443093393986/?helpref=hc_fnav.

33.     In addition, Colony Ridge provides employees with fake names and unrelated photographs of land to create their fictitious online profiles. Colony Ridge also guides employees in taking photographs from the internet for purposes of creating fake listings statewide. These fake listings cast a larger net for potential buyers and facilitate the collection of contact information for people who were not even looking for lots around Colony Ridge Neighborhoods.

34.     For example, G.B.,[7] a former employee, reported that she worked as a digital marketing lead. Colony Ridge's employment records reflect G.B. began working as a digital marketing lead on November 08, 2021. She was managed by a woman named A.P. Colony Ridge mailed G.B. nine SIM cards when she began her employment (image below). Throughout November 2021, A.P., at the direction of Colony Ridge, instructed G.B. to use the cards to create fake accounts, create fake property listings, and obtain contact information from anyone who responded positively. A.P. explicitly told the employee to create listings in areas like Alvin and downtown Houston rather than in New Caney, where Colony Ridge is actually located. A.P. also provided G.B. with files of fake photos to use for profile pictures and property listing photos.

---

[7] Pseudonyms are used throughout to refer to Colony Ridge's employees to prevent harassment and/or retaliation.



Recibido SIM card 1676, 1677, 1678, 1679, 1680, 1681, 1682, 1683, 1684 y TEL-272 INV-2893



35.     Another former employee, J.H., began working for Colony Ridge in July of 2023 as a Digital Marketing Lead. J.H. worked in the Terrenos Houston building, located in New Caney, Texas. Colony Ridge's employment records corroborate her prior employment. When she began her job, J.H. went through training led by Colony Ridge. Training materials explicitly stated that employees could not say where the listed properties were located. Materials also contained instructions on keywords to use to gain interest online, how to find images on Google to use in the listings, and how to keep accounts active so they were not flagged as spam. Colony Ridge

encouraged employees to use online images of properties with grass and trees to create the illusion that available properties were in substantially better conditions than actually exist at Colony Ridge.

36.     Colony Ridge required J.H. to make over 60 false online listings ***every day*** on fake social media accounts. In fact, J.H. recounted witnessing Colony Ridge fire another employee for failing to make 60 posts. Within posts, J.H. was explicitly prohibited from including actual photos of lots within Colony Ridge. Instead, Colony Ridge instructed her to use images of lots from Google Images to add in her listings. Colony Ridge policy and practice also forbid her from disclosing that the actual seller of the lots listed was Colony Ridge. Colony Ridge only allowed her to post in Spanish.

37.     Yet another former employee, M.V. began working for Colony Ridge in August of 2023. Colony Ridge employment records again validate her employment. She was specifically assigned to posting on Facebook. Like G.B., M.V.'s manager was A.P. When M.V. began her employment, Colony Ridge provided her with 60 fake Facebook accounts and told her to post 20-25 times a day on each account. The accounts featured names and pictures of individuals, maintaining the idea that the accounts were offering a sale of a lot by the account owner, not Colony Ridge. M.V. was prohibited from mentioning Colony Ridge in these listings. When social media users inquired about the fake listings, she would collect their contact information and send it to Colony Ridge's management team without the consumers' knowledge or consent. M.V. reported that Colony Ridge specifically advised her to target Hispanic social media users.

### C.     DEFENDANTS' MISREPRESENTATIONS ABOUT THE EXISTENCE OF BASIC CITY SERVICES

38.     Colony Ridge markets its lots through a multitude of websites and social media outlets. Colony Ridge operates over 70 websites and 80 social media pages, primarily in Spanish, dedicated to advertising the Colony Ridge development. Colony Ridge advertises, or directs others

to do so on its behalf, minimal financing requirements for a consumer to own land in the United States.

39.     These advertisements allege, among other things, that: a) the lots include all city services, such as water, electricity, and drainage; b) that "[t]he Land Comes with Services . . . [and] … [C]ity public services include sewer and water that helps you save between twenty and twenty-five thousand dollars over a septic system."; and (c) that lots are "move in ready." All of these statements are false. Colony Ridge misleads consumers into believing that their lots are ready for mobile homes or home building, when in fact, that is not the case. Instead, consumers are responsible for spending thousands (even tens of thousands) of dollars to set up city services because access, contrary to Colony Ridge's representations, is not readily available. Further, many consumers must wait *over a year* for city service installation, belying Colony Ridge's claims that lots are readily accessible for all city services.

40.     Multiple consumers have stated that Colony Ridge represented that lots have city services available, without ever mentioning the need to incur related expenses. Colony Ridge falsely informed other consumers that total installation fees would cost approximately $200, and that Colony Ridge provides all the necessary connections.

41.     Colony Ridge's training materials instruct employees to mislead consumers that lots either have city services or easy access to them. Colony Ridge clearly instructs employees to inform potential buyers that the prices for lots include city services, such as water and sewage. This fact is material to consumer decision-making because the availability of city services can save consumers the tens of thousands of dollars they would have to spend on an alternative, such as a septic system. And some of Colony Ridge's training materials also provide deceptive rebuttal points for apprehensive consumers. For example, one of the training materials titled

"Refutaciones" instructs employees to tell consumers who are concerned that the lots are too expensive that "[l]os precios que le damos incluyen servicios públicos" (the prices that we offer include public services). Another document titled "GUIA PARA DAR INFORMACION Y AGENDAR CITA" also states that "[l]os [t]errenos [v]ienen [c]on [s]ervicios" (the properties come with services).

42.    Colony Ridge also makes deceptive claims regarding the availability of city services on their social media pages. To provide just a few illustrations, on October 19, 2021, the Colony Ridge Communities Instagram account posted that a new home in Colony Ridge comes "with access to water, electricity, and drainage." On August 30, 2023, the Colony Ridge Commercial Facebook account boasted "city water & sewer included on all commercial reserves." And Terrenos Houston's Facebook page also makes numerous claims that their lots have ready access to city services (light, water, and drainage) that only require low connection fees.

43.    These claims are false; contrary to Colony Ridge's numerous representations, consumers must bear the costs associated with the installation of certain infrastructure, such as transformers, electricity poles, meters, and other connection costs of basic city services to their lots.

44.    Many consumers were unaware of *any* costs associated with city service installation to their lots since Colony Ridge represented at the time of sale that consumers' only responsibility was to call the city services company to set up said services. Other consumers were under the impression, based on Colony Ridge's representations, that the only cost to acquire city services were those associated with the "hookup" of the services and setting up the electric account (i.e. account connection fees).

45.     To gain access to city services, consumers must pay upwards of twenty thousand ($20,000) dollars and will likely not gain access to such services until months or years later than Colony Ridge claims.

46.     Colony Ridge represented to a consumer that a lot in the Santa Fe subdivision purchased in September 2022 was ready with light and water. However, the consumer was stuck paying eight thousand dollars ($8,000) to get city services.

47.     Another consumer that purchased a lot in the Santa Fe subdivision in September 2022 had to pay approximately eight thousand dollars ($8,000) just to get sewer lines connected to their lot.

48.     Despite Colony Ridge representing that city services were on the property, a consumer that purchased a lot in the Santa Fe 5 subdivision in July 2020 paid approximately twenty thousand dollars ($20,000) to get water, electricity (including an electrical pole), and sewage on their lot.

49.     When consumers are in the process of purchasing a lot from Colony Ridge, they interact with numerous Colony Ridge employees. For example, a one-page Colony Ridge document titled, "APPLICATION," lists the employees a consumer interacts with, including: sales rep; sales aid; telemarketer; digital marketing manager; pre-closer; final closer; and social media. It is likely that multiple Colony Ridge employees misrepresent the availability of city services to a consumer throughout the purchasing process. Colony Ridge keeps track of all employees involved in sales transactions for internal accounting purposes. M.V., a former employee, stated that part of their compensation was commission-based for lots sold. Therefore, it is with reason and belief that Colony Ridge maintains these records for commission purposes.

50.     Consumers were also unprepared for the significant delay to gain city service access. Some consumers have waited over a year for city services, frustrating their ability to place a mobile home or begin the home building process.

51.     Colony Ridge represented to a consumer that purchased a lot in the Santa Fe subdivision in June 2021 that their lot would be ready in December 2021, but the lot was still not ready in March 2023 when the consumer signed the property back to Colony Ridge. And another consumer that paid the full amount for their lot at the outset in October 2021 was told that Colony Ridge would turn over the property to the consumer within a year, but as of January 2024, Colony Ridge has yet to turn over the property.

52.     Consumers also indicate that Colony Ridge has continuously delayed delivering their lots due to the lack of infrastructure and access to basic city services in the undeveloped area. El Norte POA and the Liberty County Local Subdivision Rules require that city services and culverts are installed before a consumer can build a structure and/or move into their residential lot(s). Despite the restrictions imposed by El Norte POA and the Liberty County Local Subdivision Rules, Colony Ridge directs their employees to omit or misrepresent the estimated costs and fees associated with the connection and installation of city services and drainage culverts at the time of sale. This causes consumers to incur additional unforeseen expenses, like the need for replacement housing.

53.     In sum, even though Colony Ridge advertises that its lots are readily accessible and include all city services, the reality is that these services are not readily accessible, consumers must pay thousands of dollars more than anticipated, and must frequently wait over one year for the installation of basic services.

### D. DEFENDANTS' DECEPTIVE PRE-CLOSING AND CLOSING REAL ESTATE PROCESS

54.     Colony Ridge's deceptive scheme then proceeds into the pre-closing and closing phases.

55.     During the sales process, salespersons employed by Colony Ridge provide every consumer with an inventory sheet that includes the legal description of each lot, the price, the applicable interest rate, and term of the loan. The inventory sheet is non-negotiable.

56.     To pressure consumers into a seller-financed real estate transaction, the salespersons create the false impression of scarcity of residential lots.  On at least one known occasion, a salesperson contacted a consumer to inform her that the price of the lot she toured two weeks prior would be increasing almost 50% unless she purchased the lot immediately.

57.     After the consumer selects a residential lot from the inventory sheet (with the associated and non-negotiable price, interest rate, and term), the salesperson completes a sales card and requests two forms of identification from the consumer. The salesperson then submits the sales card and two forms of identification to a licensed Texas notary public employed by Colony Ridge (the "notary" or "notaries"), most or all of which are not authorized to originate loans in the State of Texas (the "pre-closing").[8]

58.     The notaries enter the consumer's information into an origination software created and maintained by Loan Originator Services LLC (the "Origination Software").

59.     The Origination Software generates the pre-closing documents, including an Application for Financing, a Mortgage and Loan Analysis, and a Land Purchase Agreement

---

[8] Colony Ridge and the notaries advertise to consumers that the notaries are "notarias" or "notarios" in Spanish, in violation of § 406.017 of the Texas Notary Public Act.

(collectively, the "pre-closing documents"). The pre-closing documents include multiple pages of small print—all in English.

60.     As discussed *supra*, however, Colony Ridge principally targets *Spanish* speakers, including many who do not speak English at all. To ostensibly bridge the gap between Spanish speakers and the English pre-closing documents, Colony Ridge's notaries provide consumers with an oral "summary" of the pre-closing documents in Spanish. But the notaries regularly omit key terms or make misrepresentations. For example, consumers are promised that the residential lot(s) they finance through CR Development will be ready to build a structure on and/or occupy by the delivery date stated in the pre-closing documents, when in fact, such residentials lots are not ready for the consumer to build a structure on and/or occupy by said delivery date.

61.     During the pre-closing, consumers execute a Land Purchase Agreement, and the notaries collect an earnest money fee and a non-refundable option fee from consumers. The Land Purchase Agreement specifically states the following: "Buyer speaks Spanish as a primary language.  This contract was explained to Buyer's satisfaction in Buyer's preferred language." This is the only document provided to consumers that purports to provide Spanish speakers with any kind of translation.

62.     Approximately one week after pre-closing, Colony Ridge provides to the buyer a Deed of Trust, Warranty Deed with Vendor's Lien, and a Promissory Note (collectively, the "closing documents"). The closing documents include multiple pages of small print in English.

63.     At closing, the notaries provide consumers with an oral "summary" of the closing documents in Spanish, again regularly misrepresenting or omitting key terms and imposing an arbitrary time limit of approximately 15 to 20 minutes to review the closing documents and sign.

64.     As described above, salespersons and notaries speak Spanish with consumers during the entire sales process, including the pre-closing and closing process. However, the pre-closing and closing documents are only provided to the consumers in English. Upon information and belief, no one at Colony Ridge's offices is fully qualified to comprehensively translate, interpret, and/or explain real estate contract provisions in English or Spanish, and at least one "notaria" or "notario" is not fully literate in English.

65.     Colony Ridge does not attach any translation to consumers of the pre-closing documents (including the Land Purchase Agreement) or the closing documents.

66.     Colony Ridge also does not furnish a Property Report pursuant to §§ 1703 and 1707 of ILSA to consumers, either before any contract or agreement is signed, or at any other time.

67.     And Colony Ridge compounds the misrepresentations at closing by informing concerned consumers that Colony Ridge will take back lots from buyers who can no longer afford their mortgage payments. At the time of sale, Colony Ridge provides consumers a document with the telephone number to call when "[r]eturning a property." The reality is that Colony Ridge has a pattern and practice of telling consumers who want to return their lots (due to hardship or other reasons) that the *consumer is responsible* for finding someone to assume their mortgage—i.e., returns are not allowed.

***Deceptive Conveyance Provisions***

68.     Colony Ridge's Land Purchase Agreements are rife with deceptive provisions that further its deceptive business model. The contracts falsely purport to convey possession at closing, contain unlawful DTPA waivers, and misrepresent which party is responsible for property taxes during the first year of ownership. These contracts are used for all, or substantially all, consumer

lot purchases. John Harris signs virtually every one of those deceptive contracts, resulting in thousands of consumer victims.

69.     These contracts' delivery provision is unambiguous: "The possession of the property will be delivered to the Buyer as of the date of closing." Colony Ridge does nothing of the sort. Colony Ridge withholds lots from purchasers after closing, for a period of generally one to two years, and does not allow them onto the land for any purpose, including clearing illegally-dumped trash or debris, leveling, or putting in culverts. Only afterwards does Colony Ridge "release" the lot, making it available to consumers to access for the first time.

70.     Second, these contracts contain an unlawful DTPA waiver. The waiver provision states, "Buyer acknowledges and stipulates that Buyer is not relying on any representation, statement, or other assertion with respect to the Property condition." On paper, this waiver purports to allow Colony Ridge to avoid a whole range of consumer claims, ranging from fraud to DTPA-based claims. However, a consumer contract may not contain a waiver of rights available under the DTPA, such purported waivers are void. DTPA § 17.42(a). While inherently deceptive, this contract clause implicates another DTPA provision which outlaws representing that an agreement confers or involves rights, remedies, and obligations which it does not have. DTPA § 17.46(b)(12). For a variety of reasons, including that this provision misrepresents Colony Ridge's and consumers' rights and remedies, this waiver provision is a *per-se* DTPA violation.

71.     Thirdly, Colony Ridge contracts falsely state that the property taxes "will be prorated as of the date of closing..." However, thousands, if not virtually all, Colony Ridge consumer deeds provide the opposite. At closing, Colony Ridge presents consumers with deeds stating (1) that customers agree to pay *all* taxes for the current year and (2) that consumers are liable for any increased tax liabilities for prior years, such as those caused by factors outside of

their control, such as changes in "land usage." When consumers sign these deeds, they are bound by the deeds' obligation to pay *all* of the taxes.

72.    In conclusion, Colony Ridge lot contracts are full of deceptive provisions that serve no purpose but to further Colony Ridge's deceptive scheme.

### E.    FLOODING AT COLONY RIDGE DEVELOPMENT

73.    The Colony Ridge Development is subject to repeated flooding and does not contain sufficient infrastructure to support the estimated 40,000 to 50,000 residents who currently reside in the Development. In fact, CR Development has been accused of causing flooding within Colony Ridge Neighborhoods due to the failure to adhere to drainage standards and regulations, which resulted in improper drainage construction. *See City of Plum Grove v. Colony Ridge Development, LLC*, Cause No. CV2016249, 253rd Judicial District Court, Liberty County; *Michael Wayne Shrader v. Colony Ridge Development, LLC et al.*, Cause No. 22DC-CV-00865, 253rd Judicial District Court, Liberty County.

74.    The Texas Commission on Environmental Quality has conducted more than 50 investigations at the development. The investigations have addressed issues with wastewater and storm water in the development of the lots sold by Colony Ridge and John Harris.

75.    Colony Ridge and John Harris hire construction companies to develop the lots in the Colony Ridge Neighborhoods. Although construction companies are retained to perform work, Colony Ridge and John Harris, as the owners of the property, are required to comply with all storm water and wastewater requirements of the State of Texas.

76.    The construction companies operating under the direction of Colony Ridge and John Harris have failed to properly implement and/or adhere to Storm Water Pollution Prevention Plans (SWPPP). These plans include, but are not limited to, erosion and sediment control.

77. Failure to follow SWPPP requirements lead to the repeated flooding of lots. Additionally, Colony Ridge fails to notify consumers about the extent and occurrence of flooding in the Development.

78. Consumers purchase the lots with no knowledge that the lots are subject to periodic flooding. Colony Ridge's salespersons never mention this information or provide any written notice to consumes regarding periodic flooding to consumers.

79. It is only upon purchasing a lot that consumers learn that their lot and the Development become flooded during rainstorms.

**F.      FALSE, MISLEADING, OR DECEPTIVE CONDUCT RELATED TO PROPERTY OWNERS' ASSOCIATIONS**

80. Defendants also systematically misled purchasers about the nature and function of the various property owners' associations ("POAs") that Defendants had established ostensibly for the benefit of Colony Ridge residents. First, beginning in 2016, Defendants engaged in deceptive acts calculated to create the false impression that the initial POAs established by Defendants—each one corresponding to a specific subdivision within the broader Colony Ridge development—continued to exist and operate only for the benefit of their respective subdivisions. In reality, Defendants shuttered and dissolved the subdivision-specific POAs in favor of a single, unified POA over the entire development—Defendant El Norte POA—that was stripped of the desirable attributes found in the subdivision POAs. Second, Defendants created the false impression that the POAs would make financial expenditures to meet the present needs of the subdivisions' property owners, and for the benefit of said property owners.

81. Starting in 2011, Defendants John Harris, T-Rex, CR Development, and CR Bella Vista formed five local POAs, one for each of the subdivisions located within the Colony Ridge development. Defendants understood and appreciated that potential purchasers valued the

existence of subdivision POAs responsible for various activities in their respective local communities, to the exclusion of other Colony Ridge subdivisions. In other words, purchasers desired the presence of a local POA funded by subdivision residents and empowered to make expenditures for the maintenance and improvement of their subdivision (and only that subdivision)—and in which purchasers could participate and have input into matters solely of concern to their subdivision. In short, Defendants cultivated the belief that local POAs provided lot owners important subdivision-specific benefits, to the exclusion of lot owners located in other subdivisions.

82.     However, in 2016 Defendants began developing and implementing a plan that sharply departed from historical practice, to dissolve all five subdivision POAs and combine them into a single POA—Defendant El Norte POA—vested with responsibility for the entire Colony Ridge development. By creating and operating this larger, all-encompassing POA, Defendants destroyed benefits ostensibly provided by the subdivision POAs that owners found desirable: a subdivision-specific POA that would be funded only by owners located in that subdivision and that could only use those funds to pay for maintenance and improvements in that subdivision.

83.     Further undermining these benefits, Defendants transferred all funds held by the subdivision POAs to Defendant El Norte POA. As a result, these commingled funds—and the annual dues collected and commingled thereafter—were no longer guaranteed to be used for subdivision-specific expenditures, much less to the benefit of each subdivision in proportion to the dues each contributed to Defendant El Norte POA. In addition, Defendants restricted the ability of owners to participate in the direction of Defendant El Norte POA to levels far lower than what existed in the subdivision POAs.

84.     To conceal the fact that these material, local benefits had been destroyed by consolidating the subdivision POAs into El Norte POA and, relatedly, to prevent owners from raising concerns over disparate treatment, Defendants knowingly created the false impression that the subdivision POAs continued to exist. Defendants deceived residents on a large scale through various misconduct. For example, to this day, Defendants represent that the dissolved subdivision-level POAs exist on multiple Colony Ridge affiliated websites, including on the subdivision-specific webpages on the main Colony Ridge site and the webpage where owners pay their annual dues.[9] In addition, shortly after terminating the subdivision POAs, Defendants publicly registered the business names of the terminated entities as assumed names for Defendant El Norte POA with the Texas Secretary of State, in order to facilitate Defendant El Norte POA masquerading as the subdivision POAs. Defendants presumably performed these acts to create the false impression that owning property in a Colony Ridge subdivision was accompanied by the benefit of the existence of a subdivision POA that provided targeted benefits for that community, thereby enabling the operation El Norte POA without disruption and any public outcry from property owners.

85.     Defendants created the false impression that the POAs made and would make financial expenditures towards making improvements needed presently in the community and would not retain funds for making future expenditures on maintenance. For instance, in Defendant El Norte POA's publicly filed governing documents, Defendants represented that for each Colony Ridge subdivision, El Norte POA was authorized to "levy [a]ssessments to promote the recreation, health, and welfare of the residents in the [respective subdivision], to fund operating expenses of [Defendant El Norte POA], and to improve and maintain the Common Areas [within the respective subdivision]." Defendants, however, have used the POAs to collect millions of dollars in dues

---

[9] *See, e.g.*, Defendant CR Land's Bella Vista Webpage, https://www.colonyridge.com/subdivisions/bella-vista/ (promoting "Liberty Bella Vista Property Owners Association" as a feature of the neighborhood).

annually to subsidize providing "neighborhood" or "maintenance" services in the future for undeveloped additions to Colony Ridge. Indeed, according to a former board member of Defendant El Norte POA, although the POA collected dues to provide neighborhood services, the POA routinely denied members' petitions for minor common area improvements—including local subdivision improvements such as a park in Camino Real. In short, Defendant El Norte POA exists to deceive consumers into paying money to benefit their communities when, in truth, it merely serves to feed Defendants' expansionist goals for the future.

## COUNT 1

## VIOLATIONS OF THE DTPA

86.     The State incorporates and adopts by reference the allegations contained in each and every preceding paragraph of this Complaint.

87.     DTPA § 17.45(1) defines the term "goods" to mean "tangible chattels or real property purchased or leased for use." Defendants provided goods to consumers in the State of Texas, as that term is defined by DTPA § 17.45(1).

88.     DTPA § 17.45(2) defines the term "services" to mean "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Defendants provided services to consumers in the State of Texas, as that term is defined by DTPA § 17.45(2).

89.     DTPA § 17.45(4) defines the term "consumer" to mean an individual, partnership, corporation, the State of Texas, or a subdivision or agency of the State of Texas who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more." The "consumers" referenced in this

Complaint are "consumers" as defined by the DTPA because they sought or acquired, by purchase or lease, goods or services from one or more Defendants, and are neither business consumers with assets of $25 million or more nor are they owned or controlled by any entity.

90. DTPA § 17.45(6) defines "trade" and "commerce" to mean:

> the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.

All Defendants and their agents have, at all times as described in the preceding and proceeding paragraphs, engaged in "trade" and "commerce" in the State of Texas, as those terms are defined by DTPA § 17.45(6).

91. Defendants, as alleged and detailed above, in the course of trade and commerce, engaged in false, misleading, and deceptive acts and practices declared unlawful in § 17.46(a) and (b) of the DTPA.

92. In violation of DTPA § 17.46(a), Defendants have engaged in false, misleading, or deceptive acts or practices.

    (a) Colony Ridge and John Harris purported to summarize Land Purchase Agreements and all other transaction terms and conditions for Spanish-speaking consumers, despite Colony Ridge's lack of qualified individuals to do so.

    (b) All violations of DTPA § 17.46(b) subsections enumerated *below* are also violations of DTPA § 17.46(a).

93. In violation of DTPA § 17.46(b)(1), Colony Ridge has falsely, expressly, or by implication, passed off goods or services as those of another, in violation of the DTPA.

    (a) listing lots for sale by individuals who not only did not exist, but who had no ownership or ability to sell said lots. Colony Ridge created the impression that these

individuals were selling the lots in their individual capacity, rather than on behalf of Colony Ridge.

94. In violation of DTPA § 17.46(b)(2), Defendants have caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

(a) Colony Ridge listed lots for sale by individuals who did not have any actual ownership of said lots, nor who were intending to actually sell the lot as advertised.

(b) As alleged in detail in Paragraphs 80-85, Defendants John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, and El Norte POA represented that lots sold to consumers included services provided by POAs which one or more Defendants terminated.

95. In violation of DTPA § 17.46(b)(5), Defendants have represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not.

(a) Colony Ridge advertised and represented that the lots for sale either had city services available or easily accessible, when in fact consumers only acquire access to city services at a great expense.

(b) Colony Ridge and John Harris falsely represented in Land Purchase Agreements and other lot contracts that the purchase consisted of not just legal title (or ownership) of the lots, but also included immediate possession.

(c) Colony Ridge inaccurately informed consumers that Colony Ridge will accept returns of lots which they had sold to consumers.

(d) Colony Ridge and John Harris falsely represented in Land Purchase Agreements and other lot contracts that the property taxes associated with the purchase would be prorated.

(e) As alleged in detail in Paragraphs 80-85, Defendants John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, and El Norte POA misrepresented the purposes, objectives, and benefits of the services provided to consumer-members of the POAs.

96.     In violation of DTPA § 17.46(b)(9), Defendants have advertised goods or services with the intent not to sell them as advertised.

(a) Colony Ridge advertised that plots were ready with city services or that the plots had ready access to city services for low hook-up costs when that was not the case.

(b) Colony Ridge advertised lots for sale by individuals with no intention for those individuals to sell the lots. The advertised sellers did not have any actual ownership of said lots, nor who were intending to actually sell the lots.

(c) Colony Ridge listed lots for sale in locations around the Greater Houston area, without the intention or capability to sell lots in those specific areas.

(d) Colony Ridge included photos of lots within their online listings that they found online. Colony Ridge had no intention or capability to sell the lots depicted in the photos used in social media postings.

(e) As alleged in detail in Paragraphs 80-85, Defendants John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, and El Norte POA falsely advertised, without intent to provide as advertised, services provided by POAs which Defendants terminated.

97.     In violation of DTPA § 17.46(b)(12), Defendants have falsely, expressly, or by implication, represented that agreements confer or involve rights, remedies, or obligations which they do not have or involve, or which are prohibited by law.

(a) Colony Ridge and John Harris falsely, expressly, or by implication, represented in the Land Purchase Agreements and other lot contracts that consumers would receive the right of possession (to the lots) at closing.

(b) Colony Ridge and John Harris falsely, expressly, or by implication, represented that waivers in the Land Purchase Agreements and other lot contracts conferred or involved rights, remedies or obligations which the contracts did not have, or which were prohibited by law.

(c) Colony Ridge and John Harris falsely, expressly, or by implication, represented in the Land Purchase Agreements and other lot contracts that consumers would only have to pay prorated property taxes for the year of purchase, when in reality, the legally-binding deeds specified consumers must pay the entire years' worth of taxes.

(d) As alleged in detail in Paragraphs 80-85, Defendants John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, and El Norte POA falsely advertised, without intent to provide as advertised, services provided by POAs which Defendants terminated.

# COUNT 2

## FRAUD IN REAL ESTATE TRANSACTIONS

### (AGAINST COLONY RIDGE, INC.; COLONY RIDGE DEVELOPMENT, LLC; COLONY RIDGE LAND, LLC; T-REX MANAGEMENT, INC.; COLONY RIDGE BV, LLC; AND JOHN HARRIS)

98.     The State incorporates and adopts by reference the allegations contained in each and every preceding paragraph of this petition.

99.     Texas Business and Commerce Code, Section 27.01 prohibits fraud in real estate transactions. The statute applies to any fraud in a transaction involving real estate and consists of: (1) false representation of a past or existing material fact, when the false representation is (a) made to a person for the purpose of inducing that person to enter into a contract; and (b) relied on by that person in entering into that contract; or (2) false promise to do an act, when the false promise is (a) material; (b) made with the intention of not fulfilling it; (c) made to a person for the purpose of inducing that person to enter into a contract; and (d) relied on by that person in entering into that contract. Tex. Bus. & Com. Code § 27.01(a).

100.    Pursuant to Texas Business and Commerce Code § 27.015, a violation of § 27.01 of the Texas Business and Commerce Code that relates to the transfer of title to real estate is a false, misleading, or deceptive act or practice, as defined by § 17.46(b) of the DTPA, and any public remedy under Subchapter E, Chapter 17, is available for a violation of § 27.01 of the Texas Business and Commerce Code.

101.    Colony Ridge and John Harris violated section 27.01(a)(1) of the Texas Business and Commerce Code by making false representations of past or existing material facts in transactions involving real estate to consumers in Texas.

102.    Specifically, Colony Ridge and John Harris represented to some consumers that city services were available at lots as a means of inducing consumers to purchase a lot to build a

home. However, many lots purchased by consumers lacked the necessary infrastructure for a consumer to build a home. Consumers become aware of this fact after all contracts have been signed and they have no ability to revoke the real estate transaction.

103. On those real estate transactions where Colony Ridge and John Harris actually informed consumers that the lot did not have city services, Colony Ridge and John Harris represented to those consumers that the cost to install the city services would be minimal, *i.e.* a few hundred dollars. Consumers were induced to purchase a lot based on this representation only to discover that the cost to install city services was in the thousands of dollars.

104. Colony Ridge and John Harris's false representations to consumers were made for the purpose of inducing those consumers to enter into contracts, and the false representations were relied on by consumers in entering into those real estate contracts.

105. Colony Ridge and John Harris also violated section 27.01(a)(2) of the Texas Business and Commerce Code when they promised consumers that the necessary infrastructure would be available for the purchased lot by a certain date, but they had no intention of fulfilling this obligation within the stated time period. This promise was made for the sole purpose of inducing a consumer to purchase a lot.

106. Consumers relied on Colony Ridge and John Harris's promise that the necessary infrastructure would be in place by a certain date when purchasing the lot. Instead, some consumers had to wait years beyond their closing date before they could access the lot to build a home.

107. Colony Ridge and John Harris made the above-referenced false representations and promises to consumers with actual awareness of their falsity.

108. Colony Ridge and John Harris failed to disclose the falsity of the representations and promises to these consumers.

109. Colony Ridge and John Harris have benefited financially from the false representations and promises made to consumers.

## COUNT 3

## CFPA VIOLATIONS (DECEPTIVE ACTS OR PRACTICES)

## (AGAINST COLONY RIDGE LAND, LLC; JOHN HARRIS; COLONY RIDGE DEVELOPMENT, LLC; COLONY RIDGE BV, LLC; AND T-REX MANAGEMENT, INC.)

110. The State incorporates and adopts by reference the allegations contained in each and every preceding paragraph of this Complaint.

111. The CFPA, which prohibits "unfair, deceptive or abusive acts or practices," explicitly delegates to state attorneys general the authority to bring Federal civil enforcement actions in order to enforce the CFPA and to secure remedies provided therein. *See* 12 U.S.C. § 5552(a)(1). This provision is subject to a requirement that a state attorney general provide prior notice to the Consumer Financial Protection Bureau before filing suit. The State has provided such notice.

112. The CFPA prohibits "any covered person or service provider . . . [from engaging] in any unfair, deceptive, or abusive act or practice." *See* 12 U.S.C. § 5536(a)(1)(B).

113. The CFPA defines a "covered person" to include any person that engages in offering or providing a consumer financial product or service, as well as any affiliate of such a covered person that also acts as a service provider to such covered person. *See* 12 U.S.C. § 5481(6)(A)-(B).

114. The CFPA defines an "affiliate" as any person that controls, is controlled by, or is under common control with another person. *See* 12 U.S.C. § 5481(1).

115.    The CFPA defines a "service provider" as any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service. *See* 12 U.S.C. § 5481(26)(A).

116.    Under the CFPA, the term "related person" is deemed a covered person for purposes of any provision of Federal consumer financial law. *See* 12 U.S.C. § 5481(25)(B). The CFPA defines a "related person" as any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered person. *See* 12 U.S.C. § 5481(25).

117.    CR Land is a covered person under the CFPA because it extends credit. *See* 12 U.S.C. § 5481(15)(A)-(i).

118.    John Harris is a covered person under the CFPA because he is an affiliate, service provider, and related person within the meaning of the CFPA. *See* 12 U.S.C. § 5481(1), 5481(6)(B), 5481(25), 5481(26)(A).

119.    CR Development, CR Bella Vista, and T-Rex are also covered persons because they are affiliates and service providers within the meaning of the CFPA. *See* 12 U.S.C. § 5481(1), 5481(6)(B), 5481(26)(A).

120.    As described above, in advertising, marketing, and offering seller-financing for residential lots, CR Land, CR Development, CR Bella Vista, T-Rex, and John Harris misrepresented, either expressly or by implication:

> (a) that the residential lots that CR Land finances are move in ready and/or include all city services and culvert(s), when in fact the consumer must spend thousands of dollars to connect and/or install said city services and culvert(s) to their residential lots;

(b) the estimated costs and/or fees associated with the connection and/or installation of city services and culvert(s) to each residential lot; and

(c) the date by which the residential lots will be ready for the consumer to build a structure on and/or otherwise occupy.

121. In advertising, marketing, and offering seller-financing for residential lots, CR Land, CR Development, CR Bella Vista, T-Rex, and John Harris omitted key terms and conditions associated with the real estate transaction, including, *inter alia*:

(a) that El Norte POA imposes restrictions on most or all residential lots, which prevent consumers from immediately building a structure and/or otherwise occupying the residential lot;

(b) the estimated costs and/or fees associated with the connection and/or installation of city services and culvert(s) to each residential lot; and

(c) the actual date by which the residential lots will be ready for the consumer to build a structure on and/or otherwise occupy.

122. CR Land, CR Development, CR Bella Vista, T-Rex, and John Harris's misrepresentations and omissions concerning the real estate transactions and loans at issue are material because they are likely to affect a consumer's ability to assess the *total* financial impact of the real estate transaction and associated loan.

123. The above-described statements and omissions are likely to mislead a consumer acting reasonably under the circumstances.

124. These representations and omissions, in light of the representations made, are deceptive omissions and deceptive acts or practices that violate §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT 4

## CFPA VIOLATIONS (ILSA VIOLATIONS)

## (AGAINST COLONY RIDGE DEVELOPMENT, COLONY RIDGE BV, AND JOHN HARRIS)

125.    The State of Texas has authority to enforce the CFPA through violations of ILSA because the statute is an "enumerated consumer law" under the CFPA. *See* 12 U.S.C. §§ 5481(12)(R), 5481(14), 5552(a)(1). § 5552 of the CFPA authorizes states to bring CFPA claims not just for engaging in "unfair, deceptive, or abusive" conduct, but also against "covered persons" or "service providers" who offer or provide "to a consumer any financial product or service not in conformity with Federal consumer law, or otherwise commit an act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

126.    ILSA is a consumer protection statute enacted to protect consumers from developers selling undeveloped land. ILSA applies to the developer or agent "who directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease" any lot in a subdivision. 15 U.S.C. §§ 1701(5), (6).

127.    ILSA requires the developer to provide each consumer with a disclosure document called a Property Report that contains relevant information about the subdivision. This Property Report must be delivered before the consumer signs the contract. 15 U.S.C. § 1703(a)(1)(B)-(D). A Property Report is a detailed document that should include information about the risks of buying land; a statement on the general terms and conditions, including the range of selling prices of the lots in the subdivision; and information about the general topography of the subdivision, including whether the subdivision is included in a flood plain or subject to flooding and whether the lots require draining or fill prior to being used as a homesite. *See* 15 U.S.C. §§ 1707, 12 C.F.R. §§ 1010.107, 1010.115.

128. ILSA also prohibits any developer or agent from misrepresenting a material fact regarding the lot, or misrepresenting that roads, sewers, water, gas, or electric service will be provided or completed by the developer without stipulating in the contract for sale that such services will be provided or completed. *See* 15 U.S.C. § 1703(a)(2)(A)-(D).

129. The regulations define unlawful sales practices involving the sale of a lot under ILSA as: (1) giving a contract to a consumer encouraging them to sign before delivery of the Property Report; (2) referring to the Property Report as anything other than a Property Report; (3) using a Property Report, note, contract, deed, or other document prepared in a language other than that in which the sales campaign is conducted, unless an accurate translation is provided; and (4) representing a lot as a homesite or building lot unless the lot is free from periodic flooding. *See* 12 C.F.R. §§ 1011.20(b),(c),(f),(i)(4), 15 U.S.C. § 1718.

130. In addition, the regulations bar a developer from engaging in misleading sales practices. *See* 12 C.F.R. § 1011.25. Among the numerous misleading sales practices defined by the regulations, developers cannot represent "uses to which the offered land can be put unless the land can be put to such use without unreasonable cost to the purchaser and unless no fact or circumstance exists which would prohibit the immediate use of the land for its represented use." 12 C.F.R § 1011.25(c).

131. Colony Ridge Development, Colony Ridge BV, and John Harris sold lots within the subdivisions of the Development that were not exempt under 15 U.S.C. § 1702.

132. Colony Ridge Development, Colony Ridge BV, and John Harris, directly or indirectly, used means or instruments of communication in interstate commerce in the sale of lots. Specifically, Colony Ridge Development, Colony Ridge BV, and John Harris offered to sell lots within the Development on the internet and in telemarketing calls.

133.	Colony Ridge Development, Colony Ridge BV, and John Harris are subject to the requirements of ILSA and have violated the statute.

134.	Upon information and belief, Colony Ridge Development, Colony Ridge BV, and John Harris have not provided any consumer with the Property Report containing all required information before the consumer signs the contract for the purchase of the lot.

135.	As previously discussed, Colony Ridge Development, Colony Ridge BV, and John Harris conducted a large portion of their sales campaign in Spanish. This includes advertising on their websites, Facebook postings, YouTube videos, local publications, and ads within the Development's community.

136.	Colony Ridge Development, Colony Ridge BV, and John Harris violated ILSA by failing to provide non-English speakers with contracts or any other documents in any other language than English.

137.	The statute requires an accurate translation of documents provided to the buyer. Colony Ridge Development, Colony Ridge BV, and John Harris do not employ certified translators to orally explain all documents provided to consumers.

138.	Colony Ridge Development, Colony Ridge BV, and John Harris also repeatedly represent lots as a homesite or building lot when the lots are not free from periodic flooding.

## CIVIL PENALTIES

139.	The State believes that after a reasonable opportunity for discovery, the evidence will likely show that Defendants knowingly violated a federal consumer financial law when it engaged in the acts and practices described herein. Accordingly, the State seeks the imposition of third tier civil penalties up to One Million Dollars ($1,000,000) for each day during which such violation continues. *See* 12 U.S.C. §§ 5565(a)(2)(H), 5565(c)(1), 5565(c)(2)(C).

140. DTPA § 17.47(c) and Texas Business and Commerce Code § 27.015 authorize the Office of the Texas Attorney General's Consumer Protection Division to request a civil penalty to be paid to the State of Texas in an amount of: (1) not more than $10,000 per violation; and (2) if the act or practice that is subject of the proceeding was calculated to acquire or deprive money or other property from a consumer who was 65 years of age or older when the act or practice occurred, an additional amount of not more than $250,000.

141. Accordingly, the State requests that the Court award civil penalties against Defendant in this case, pursuant to DTPA §§ 17.47(c)(1) and (2), Texas Business and Commerce Code § 27.015.

## ATTORNEYS' FEES AND COSTS

142. This action is brought pursuant to DTPA §§ 17.41, *et seq.*, Texas Business and Commerce Code § 27.01, and Consumer Financial Protection Act 12 U.S.C. § 5565, under which injunctive relief, civil penalties, attorneys' fees, and costs of court are recoverable by the Office of the Texas Attorney General.

143. Accordingly, the State seeks to recover attorneys' fees and costs of court for the prosecution of this injunctive enforcement action, as provided by Texas Government Code § 402.006(c).

## CONDITIONS PRECEDENT

144. All conditions precedent to the State's claim for relief have been performed or have occurred.

## PRAYER FOR RELIEF

145.    **WHEREFORE**, the State respectfully requests that this Honorable Court issue an Order:

A.    Declaring Defendants' conduct as described herein above to be in violation of the DTPA and CFPA.

B.    Permanently enjoining Defendants and all other persons acting on its behalf, directly or indirectly, from violating the DTPA and CFPA, and any provision of Federal consumer financial law, as defined by 12 U.S.C. § 5481(14), and any amendments thereto;

C.    Permanently enjoining John Harris and Colony Ridge, their agents, employees, and anyone acting in active concert or participation with them, from:

i.    creating social media accounts impersonating those who have no relation to said social media accounts;

ii.    using false or misleading images within their social media accounts;

iii.    falsely representing the location of lots within advertisements;

iv.    advertising lots without the intention to sell the lots as advertised;

v.    failing to provide accurate translations of documents in selling lots; and

vi.    misrepresenting the condition of lots for sale.

D.    Permanently enjoining Defendants John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, and El Norte POA, their agents, employees, and anyone acting in active concert or participation with them, from:

i.    Representing, directly or indirectly, that any POA that one or more Defendants purported to have terminated exists;

ii. Representing or advertising, directly or indirectly, that membership to any POA includes services—or confers benefits, rights, or obligations—which such membership does not include or confer;

iii. Collecting on—or sending to any third party to collect on—any delinquent POA funds from any real property owner in any Colony Ridge subdivision, that have accrued at any time;

iv. Foreclosing on any lien on real property for unpaid amounts due to any Colony Ridge POA, if any such unpaid amounts accrued from the date Houston El Norte POA was formed to the date the Court grants a Permanent Injunction, if any;

v. Transferring, moving, concealing, spending, or withdrawing funds derived from the transfer of any asset (including, but not limited to, real property assets) from any Colony Ridge POA, to one or more Defendants;

vi. Collecting any funds from real property owners in any Colony Ridge subdivision, unless such funds are to be spent only for the benefit of the residents of that specific Colony Ridge subdivision; and

vii. Spending any funds collected from real property owners in any Colony Ridge subdivision, unless such funds are spent only for the benefit of the residents of that specific Colony Ridge subdivision.

E. Directing the recission or reformation of contracts where necessary to redress injury to consumer borrowers;

F.     Directing Defendants to make full restitution to all consumers who have suffered losses as a result of the acts and practices alleged in this Complaint and any other acts or practices proved by the State, pursuant to DTPA § 17.47(d);

G.     Directing Defendants to award damages, restitution, equitable, and other monetary relief under 12 U.S.C. § 5565(a);

H.     Directing Defendants to pay the State appropriate civil penalties pursuant to the CFPA and the DTPA;

I.     Directing Defendants to pay the State's investigative and litigation costs in this matter; and

J.     Granting such other general, equitable, and/or further relief as the Court deems just and proper.

DATED: March 14, 2024

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

RYAN S. BAASCH
Chief for Consumer Protection Division

*s/ Richard Berlin*
RICHARD BERLIN
Attorney-in-Charge
Texas Bar No.: 24055161
Southern District of Texas Bar No.: 724520
Consumer Protection Division
Office of the Attorney General
808 Travis Street, Suite 1520

Houston, Texas 77002
Telephone: 713-223-5886
Fax: 713-223-5821
Email: rick.berlin@oag.texas.gov

DANIEL ZWART
Texas Bar No.: 24070906
Southern District of Texas Bar No.: 1086296
daniel.zwart@oag.texas.gov

KAYLIE BUETTNER
Texas Bar No.: 24109082
Southern District of Texas Bar No.: 3748037
kaylie.buettner@oag.texas.gov

MEREDITH SPILLANE
Texas Bar No.: 24131685
Southern District of Texas Bar No.: 3865437
meredith.spillane@oag.texas.gov

GABRIELA MARTINEZ
Texas Bar No.: 24085454
Southern District of Texas Bar No.: 3866164
gabriela.martinez@oag.texas.gov

NORMAN CAHN
Texas Bar No.: 24125161
Southern District of Texas Bar No.: 3867272
norman.cahn@oag.texas.gov

DEVON SANDERS
Texas Bar No.: 24136103
Southern District of Texas Bar No.: 3866810
devon.sanders@oag.texas.gov

MONICA F. RAMIREZ
Texas Bar No.: 24068621
Southern District of Texas Bar No.: 2618697
monica.ramirez@oag.texas.gov

JASON MCKENNEY
Texas Bar No.: 24070245
Southern District of Texas Bar No.: 3866898
jason.mckenney@oag.texas.gov

Assistant Attorneys General

Consumer Protection Division
Office of the Attorney General
808 Travis Street, Suite 1520
Houston, Texas 77002
Telephone: 713-223-5886
Fax: 713-223-5821

**ATTORNEYS FOR PLAINTIFF,
STATE OF TEXAS**