## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 4:24-cv-00941** |
| | ) | |
| **COLONY RIDGE, INC.; COLONY** | ) | |
| **RIDGE DEVELOPMENT, LLC;** | ) | |
| **COLONY RIDGE BV, LLC; COLONY** | ) | |
| **RIDGE LAND, LLC; T-REX** | ) | |
| **MANAGEMENT, INC.; JOHN HARRIS;** | ) | |
| **HOUSTON EL NORTE PROPERTY** | ) | |
| **OWNERS ASSOCIATION, INC.; and** | ) | |
| **CH&P MANAGEMENT LLC,** | ) | |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, STATE OF TEXAS (the "Plaintiff" or "State"), acting by and through the Attorney General of Texas, Ken Paxton, brings this action against Defendants COLONY RIDGE, INC.; COLONY RIDGE DEVELOPMENT, LLC; COLONY RIDGE BV, LLC; COLONY RIDGE LAND, LLC; T-REX MANAGEMENT, INC.; JOHN HARRIS; HOUSTON EL NORTE PROPERTY OWNERS ASSOCIATION, INC.; and CH&P MANAGEMENT LLC (collectively, "Defendants") for violating the Texas Deceptive Trade Practices—Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41–17.63; Tex. Bus. & Com. Code § 27.01, Fraud in Real Estate Transactions; the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5552(a), 5536; and the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. §§ 1701-1720.

## INTRODUCTION

1.      Colony Ridge, Inc. (CRI); Colony Ridge Development, LLC (CR Development); Colony Ridge BV, LLC (CR Bella Vista); Colony Ridge Land, LLC (CR Land); T-Rex Management, Inc. (T-Rex); (collectively, "Colony Ridge" or "Colony Ridge Defendants"); and their owner, John Harris, have built a sprawling community northeast of Houston on a foundation of false, misleading, and deceptive sales, marketing, and lending practices. Colony Ridge's business model is predicated on churning land purchasers through a foreclosure mill. Namely, Colony Ridge targets foreign born and Hispanic consumers with limited or no access to credit with promises of cheap, ready to build land and financing without proof of income. And Colony Ridge lies in a multitude of ways about the conditions that those buyers will experience on the property. Many of those conditions, once discovered, preclude the buyer from actually making any practical use of the land. The result is that the buyer, having discovered that they cannot meaningfully use the land, defaults on the land financing at jaw-dropping rates. Colony Ridge then forecloses on the buyer, re-possesses the land having lost nothing, and then turns around and sells the same land *again* to another unsuspecting buyer with the same deceptive set of misrepresentations. At best, consumers struggle with unexpected financial burdens for years to avoid foreclosure, to the benefit of Colony Ridge and its pernicious business model.

2.      Indeed, the proof of Colony Ridge's scheme is in the pudding. On October 31, 2023, a Colony Ridge representative testified before the Texas Senate that CR Land's foreclosure rate is 12%. This alarming figure is roughly ***50 times greater than the 2023 nationwide foreclosure rate of 0.26%*** (roughly 1 in every 400 homes were foreclosed in the United States in 2023).[1] Even in 2009, at the height of the U.S. housing crisis, the foreclosure rate was only 2.22%

---

[1] *See U.S. Foreclosure Activity Increases From 2022 But Still Below Pre-Pandemic Levels*, ATTOM (Jan. 11, 2024), https://www.attomdata.com/news/market-trends/foreclosures/attom-2023-year-end-u-s-foreclosure-market-report/.

nationwide (roughly 1 in every 45 homes were foreclosed).[2] Colony Ridge's pervasive scheme lurks just below the surface, with a foundation built upon deception, that results in massive foreclosure rates.

3.      Colony Ridge's scheme begins with aggressively targeting Spanish speakers, including a significant share from international communities. Former employees state that Colony Ridge instructed them to avoid consumers who can speak English or do not appear to be of Latino or Hispanic heritage. Colony Ridge's main sales website, terrenoshouston.com, is primarily in Spanish. And as explained *infra* at ¶¶ 33, 53, and 79-83, this deliberate focus on Spanish-speakers and foreign residents facilitates Colony Ridge's ability to deceive buyers with English-only paperwork.

4.      The next layer of Colony Ridge's scheme involves digital marketing employees, armed with multiple telephone SIM cards, creating social media accounts using "burner" telephone numbers. Colony Ridge directs these employees to use fake names and photographs of homes found through Google image searches to deceive unsuspecting consumers into believing that they are communicating with an individual homeowner in a "for sale by owner" transaction. Colony Ridge's digital marketing employees are directed to obtain consumers' contact information through these fake social media accounts, which are then provided to Colony Ridge's telemarketing team for consumer outreach and telemarketing purposes. The digital marketing employees are directed to pretend to "list" homes and/or lots around the Greater Houston area to cast a wider net of potential consumers. In addition, Colony Ridge provides digital marketing employees with dozens of SIM cards to bypass limitations on the amount of social media accounts

---

[2] *See U.S. 2009 foreclosures shatter record despite aid*, Reuters (Jan. 14, 2010), https://www.reuters.com/article/idUSTRE60D0LZ/.

associated to a single user; thus, allowing digital marketing employees to utilize multiple fake social media accounts to lure potential consumers.

5.     Then, when Colony Ridge markets its *own* properties, it falsely represents that all lots in Colony Ridge are "move in ready" and have access to all "city services," specifically including sewer, water, and electricity. Colony Ridge assures wary consumers that, at most, they will only have to pay a few hundred dollars to the utility provider to set up an account. But as many Colony Ridge consumers later discover, the properties are not "move in ready" and instead the consumer must often wait months, sometimes years, before they can obtain city services and occupy the lot. Further, if any utility infrastructure exists at all, many of the properties require thousands of dollars in improvements, if not tens-of-thousands. Buyers are literally required to install such things as transformers or light poles before they are even allowed to occupy the land they purchased.

6.     Colony Ridge also conceals other material facts about the poor living conditions in the development. For example, even though there have been two suits filed against one or more Defendants related to the severe flooding that occurs at the Development, Colony Ridge and John Harris continue to falsely represent to consumers at the time of sale that the residential lots in the Development are not subject to repeated flooding. Colony Ridge and John Harris also fail to inform consumers at the time of sale that the Development does not contain the infrastructure necessary to support the estimated 40,000 to 50,000 residents who currently reside in the Development.

7.     To further entice consumers to buy a Colony Ridge lot, certain Defendants—including John Harris and CH&P—promote to potential purchasers the benefits of membership in various local neighborhood property owners' associations (POAs), falsely conveying that membership dues are used solely for the benefit of the respective neighborhoods and that the

nonprofit POAs afford residents opportunities to participate in matters that impact the local community. Nothing could be further from the truth. Indeed, certain Defendants executed a covert scheme to terminate several neighborhood-specific POAs and "merged" their assets into Defendant El Norte POA. El Norte POA provided *none* of the benefits that potential purchasers and current members valued and found desirable. To avoid detection, they created the false impression that the terminated nonprofit POAs continued to operate as promised: as community organizations that provide localized benefits to residents.

8.      Today, membership in El Norte POA is required for each of the tens of thousands of Colony Ridge purchasers, at the cost of approximately $120 per year. However, in sharp contrast to how bona fide POAs operate and the representations made by Defendants CH&P, El Norte POA, and others, Defendants fail to spend the millions in collected POA dues to improve or benefit consumers' neighborhoods. To provide but one example, Defendants claim that El Norte POA "protects" and "maintains" the real property it holds on behalf of the community; in reality, El Norte POA *owns no such property.* Defendants surreptitiously conveyed away the real property that the nonprofit El Norte POA took from the neighborhood POAs (as part of the "merger") to one or more third parties for little or no consideration. Despite the POA taking hundreds of thousands of dollars in dues, Defendants do nothing to enhance the welfare of El Norte POA's dues-paying members, some of whom live amongst neglected trash heaps, on empty lots, or in ramshackle or improvised dwellings.

9.      All of this deceit and misconduct earns Colony Ridge massive profits because of the unique combination of the seller-only financing offered by Colony Ridge coupled with its foreclosure practices.

10.     *First,* CR Land offers seller-financed loans to consumers for the lots it sells and then operates as the mortgage servicing company on the resulting loans. Colony Ridge is the exclusive (or near exclusive) provider of loans and mortgage servicer for all lots under its control. And CR Land's financing is available only at extraordinarily high rates. Specifically, CR Land offers 20-year loans with a 12.9% interest rate coupled with only a *minimal* down payment (typically $500 or less). In his October 31, 2023 testimony before the Texas Senate, the Chief Financial Officer for CR Land, Craig Parker, testified that CR Land's financing terms are based on a "loan-to-value" ratio.[3] Under these terms, for example, as illustrated below, a typical consumer would end up paying $85,461.98 for a lot of land that is presumably worth $30,900.

## Mortgage and Loan Analysis

| Analysis | | |
|---|---|---|
| Sales Price | | $30,900.00 |
| Down Payment | | $320.00 |
| Amount Financed | | $30,580.00 |
| Annual interest (e.g., 8.25) | | 12.900 |
| Duration of loan (in years) | | 20 |
| Start date of loan | | July 1, 2020 |
| | | |
| Monthly payments | | 356.09 |
| Total number of payments | | 240 |
| Yearly principal + interest | | 4,273.10 |
| | | |
| Principal amount | | 30,580.00 |
| Finance charges | | 54,881.98 |
| Total cost | | 85,461.98 |

*To display each month's calculations, extend the table by selecting the bottom row of data and filling down to row* 259 [4]

11.     CR Land does not evaluate consumers' credit history, financial profile, disposable income, or pre-existing financial obligations when determining whether a consumer's loan application should be approved. And so, predictably, many consumers default. That would harm ordinary lenders, who typically incur a loss when a buyer defaults and they are forced to foreclose

---

[3] A loan-to-value ratio is a measure comparing the amount of a mortgage with the appraised value of the property. The higher a down payment, the lower the loan-to-value. Most mortgage lenders use a loan-to-value ratio in deciding whether to lend to a borrower and to determine if they will require private mortgage insurance.

[4] This image represents a document produced by Colony Ridge, Inc., Colony Ridge Development, LLC, Colony Ridge Land, LLC, and John Harris in response to a Civil Investigative Demand ("CID") issued by the Office of the Texas Attorney General on August 24, 2023. The image has been resized to fit this First Amended Complaint.

on a residential property. But not so with Colony Ridge. Unlike traditional mortgage lenders, Colony Ridge profits from the high number of foreclosures. On information and belief, CR Land routinely repurchases the lots in foreclosure and resells them at *higher prices*. In fact, CR Land often resells a foreclosed lot to the *very same consumer* at a significantly higher price. The more foreclosures CR Land initiates, the higher likelihood it will acquire residential lots with free improvements which make the foreclosures profitable. Thus, Colony Ridge's business model incentivizes foreclosures.

12.     The Attorney General brings this action to penalize and put an end to Colony Ridge's deceptive business model.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by the State in a "district court of the United States in that State . . . to enforce provisions of the" CFPA. 12 U.S.C. § 5552(a)(1).

14.     This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

15.     Venue is proper in this district because Defendants are located, reside, and/or do business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

## PARTIES

16.     The **Office of the Attorney General of Texas** (OAG) is authorized to bring this action to prevent deceptive acts or practices under 12 U.S.C. § 5552(a), which authorizes the State to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for

Defendants' acts or practices that violate the CFPA. The State also brings this action pursuant to

12 U.S.C. § 5536(a)(1)(A), which authorizes the State to seek, and the Court to order, permanent

injunctive relief, monetary relief, and other relief for Defendants' acts or practices that violate

other federal consumer financial laws set forth in the CFPA. In addition, the State brings this action

pursuant to the authority granted to it by § 17.47 of the DTPA, § 17.41, *et seq.*, and § 27.015 of

the Texas Business & Commerce Code upon the ground that Defendants have engaged in false,

deceptive, and misleading acts and practices in the course of trade and commerce as defined in,

and declared unlawful by §§ 17.46(a) and (b) of the DTPA and § 27.01 of the Texas Business &

Commerce Code.

17.     **Defendant Colony Ridge, Inc.** is a Texas corporation which regularly conducts

business in Montgomery County, Texas. CRI's principal place of business is located at 1712 N.

Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant has entered an

appearance in this case. Formed in 2018, CRI is owned by John Harris, William Harris, Kevin

Harris, Robin Lane, and Heath Marek. CRI owns 100% of Colony Ridge Development, LLC;

Colony Ridge BV, LLC; Colony Ridge Land, LLC; and other CRI subsidiaries.[5] The CRI entities

operate in concert to purchase, develop, sell, and maintain the Colony Ridge Development.

18.     **Defendant Colony Ridge Development, LLC d/b/a Terrenos Houston** is a Texas

Limited Liability Company which regularly conducts business in Montgomery County, Texas. CR

Development's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217,

Conroe, TX, where they may be reached. Defendant has entered an appearance in this case. CR

Development develops infrastructure and sells lots for the following five (5) Colony Ridge

---

[5] The following entities are subsidiaries of Colony Ridge, Inc.: T-Rex Management, Inc.; Colony Ridge Development, LLC; Colony Ridge Land, LLC; Colony Ridge Investments, LLC; Colony Ridge BV, LLC; CR Farms, LLC; Liberty Paving, LLC; Colony Ridge Tracts, LLC; Liberty Water Holdings, LLC; Duke Vacation, LLC; Casas Houston, LLC; and Liberty County Utilities, LLC.

Development subdivisions: Santa Fe; Rancho San Vicente; Camino Real; Montebello; and Grand San Jacinto (all Liberty County developments excluding Bella Vista).

19.    **Defendant Colony Ridge BV, LLC** is a Texas Limited Liability Company which regularly conducted business in Montgomery County, Texas. CR Bella Vista's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant has entered an appearance in this case. CR Bella Vista developed infrastructure and sold lots for Colony Ridge's Bella Vista subdivision. Colony Ridge completed development and sold all lots in this subdivision as of 2022.

20.    **Defendant Colony Ridge Land, LLC** is a Texas Limited Liability Company which regularly conducts business in Montgomery County, Texas. CR Land's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant has entered an appearance in this case. CR Land serves as the lender and mortgage servicing company for the residential lots sold by Colony Ridge Development, LLC and Colony Ridge BV, LLC. CR Land also reacquires lots from foreclosure and transfers them to CR Development for resale. Colony Ridge's primary website is colonyridge.com, which is copyrighted by CR Land.

21.    **Defendant T-Rex Management, Inc.** is a Texas corporation which regularly conducts business in Montgomery County, Texas. T-Rex's principal place of business is located at 1712 N. Frazier St., Suites 216 & 217, Conroe, TX, where they may be reached. Defendant has entered an appearance in this case. T-Rex manages and collects management fees from all CRI subsidiaries, including, but not limited to, Colony Ridge Development, LLC; Colony Ridge BV, LLC; and Colony Ridge Land, LLC. T-Rex pays and employs all the individuals that work for

Colony Ridge Development, LLC; Colony Ridge Land, LLC; Colony Ridge Investments, LLC; and Colony Ridge BV, LLC.[6]

22.     **Defendant John Harris** is an individual who is named as a defendant in his individual capacity, in his capacity as a manager or director of Defendant Houston El Norte Property Owners Association, Inc. and as an officer of the Colony Ridge Defendants. John Harris has entered an appearance in this case.

23.     Because of his dominant role in owning, controlling, managing, and operating Colony Ridge and because he is the primary officer conducting business on behalf of T-Rex (which manages the various LLCs named as defendants herein), John Harris is personally responsible and liable for a range of false, misleading, and deceptive acts and practices. As alleged below in greater detail, John Harris directs Colony Ridge employees to mislead consumers into entering into deceptive and unlawful Land Purchase Agreement transactions and to use deceptive and unlawful deeds on a company-wide basis, among other things. Further, John Harris routinely engages in false, misleading, or deceptive transactions with consumers, as evidenced by his signature effectuating agreements with and conveying property to consumers.

24.     **Defendant Houston El Norte Property Owners Association, Inc.** ("El Norte POA") is a Texas corporation that regularly conducts business in Montgomery County, Texas. El Norte POA's principal place of business is located at P.O. Box 1920, Conroe, TX 77305. Defendant has entered an appearance in this case. Defendant El Norte POA was formed following the dissolution of several neighborhood-specific POAs—which El Norte POA deceptively continues to do business as—specifically, the five now voluntarily terminated neighborhood-specific POAs known as: Liberty Montebello Property Owners Association, Inc. (formed in 2011);

---

[6] The funding for T-Rex to make any such payments comes from Colony Ridge Land, LLC.

Liberty Bella Vista Property Owners Association, Inc. (formed in 2012); Rancho San Vicente Property Owner's Association, Inc. (formed in 2013); Grand San Jacinto Property Owner's Association, Inc. (formed in 2013); and Camino Real Property Owner's Association, Inc. (formed in 2015).

25.     At all relevant times, John Harris has been the President of El Norte POA and served as a member and the Chairperson of its Board of Directors, positions he likewise held in the earlier and now-defunct neighborhood-specific POAs. Importantly, John Harris also serves as the President of Defendant T-Rex, the legal entity responsible for the management of Defendants CR Development and CR Bella Vista.

26.     Further, John Harris—individually and in addition to T-Rex, and CR Development or CR Bella Vista—have served as the legal declarants to Defendant El Norte POA's and the neighborhood-specific POAs' governing documents, which include, but are not limited to, the POAs' governing bylaws and declarations of covenants, conditions, and restrictions, to which POA members are bound. These declarant-Defendants, individually and in conjunction, devised of and executed the POAs' governing documents—including those of Defendant El Norte POA—which granted the declarants (John Harris and T-Rex, with CR Development or CR Bella Vista) complete control over all operations, governance, and activities of the POAs. These activities include, but are not limited to, POA-related marketing materials and representations posted on colonyridge.com. As alleged herein, at all times John Harris had (and continues to have) actual or effective control over Defendants T-Rex, CR Development, and CR Bella Vista. On information and belief, John Harris directs such entities to designate him the person to supervise, operate, run, and ultimately bear responsibility for the activities of the Colony Ridge POAs, alongside co-

declarant Defendants T-Rex, and CR Development or CR Bella Vista—and Defendant CH&P Management LLC, as alleged *infra*.

27.    **Defendant CH&P Management LLC** ("CH&P") is a Texas Limited Liability Company founded on September 10, 2013, that regularly conducts business in Montgomery County, Texas. CH&P is located at 1712 North Frazier Street, Suite 216, Conroe, TX 77301, along with other Defendants and Colony Ridge affiliated entities. Currently, the registered agent for CH&P is Savannah R. Crihfield, 1712 N. Frazier Street, Suite 215, Conroe, TX 77301. Defendant CH&P may be served with process by serving its registered agent, Savannah R. Crihfield, 1712 N. Frazier Street, Suite 215, Conroe, TX 77301, among other methods.

28.    Since its inception, Defendant CH&P has been owned and operated by its President, Ms. Savannah Crihfield. At all relevant times, CH&P served (and continues to serve) as the exclusive management company and managing agent of Defendant El Norte POA and held the same roles for the earlier and now-defunct neighborhood-specific POAs. Notably, Ms. Crihfield is the niece of John Harris: the person responsible for authorizing the relevant POAs to enter management contracts with Defendant CH&P, totaling millions of dollars, on a periodic and ostensibly non-competitive basis. In connection with CH&P's managerial role, John Harris, T-Rex, and CR Development or CR Bella Vista (the declarants to the POAs' governing documents), and El Norte POA appointed Ms. Crihfield to the corporate officer position of Managing Secretary for El Norte POA and authorized her to open bank account(s) on the POA's behalf.

29.    Subject to the direction of, and alongside John Harris, T-Rex, CR Development, CR Bella Vista, and/or El Norte POA, Defendant CH&P's managerial role encompasses all aspects of day-to-day operations. Among other things, CH&P assists and has assisted in managing El Norte POA and the earlier neighborhood-specific POAs in all aspects of their respective

operations, including but not limited to, preparing financial records; providing reports to the Boards of Directors on all POA matters; communicating directly with the POAs' members; and authoring, publishing, and/or distributing promotional and informational materials related to the POAs to current and prospective purchasers and consumers. In conclusion, John Harris, CH&P, and T-Rex, along with CR Development or CR Bella Vista, all participated in the unlawful conduct related to neighborhood-specific POAs and El Norte POA alleged herein.

## FACTS

### A.    BACKGROUND

30.    Beginning in 2011 on marshy land previously used as timber farms, Colony Ridge started with a single subdivision. Individuals can purchase individual lots to build their dream home, or multiple lots for larger space or commercial use. The development boasts half an acre or larger lots and markets primarily to Spanish speaking individuals.

31.    Since approximately 2016, Colony Ridge's growth has been exponential. Growing from a single subdivision, Colony Ridge now sprawls over 33,000 acres of land (over 50 square miles) in northwest Liberty County and approximately 40,000-50,000 residents call the development home. (By comparison, the nearby community of The Woodlands, Texas, commenced in 1974 and home to over 100,000 residents, is only 43.9 square miles.) The vast size and rapid growth of the development has led to shortages in policing, schools, and animal control. The entire Colony Ridge Development currently consists of the following six (6) subdivisions: Bella Vista; Santa Fe; Rancho San Vicente; Camino Real; Montebello; and Grand San Jacinto (the "Colony Ridge Neighborhoods," "Colony Ridge Subdivisions," "Colony Ridge Development" or "Development").

32.     Colony Ridge promotes its development, in part, by engaging in a deceptive marketing scheme based on harvesting users' contact information by advertising lots for sale under the guise of "for sale by owner" individual transactions. Once they obtain the consumers' contact information, telemarketers relentlessly contact consumers about land for sale in the Colony Ridge development. Colony Ridge misleads consumers by marketing these lots as "move in ready" and complete with all "city services" available, without disclosing that hundreds, if not thousands, of dollars in infrastructure improvements are necessary to move onto the lot.

33.     Colony Ridge targets primarily Spanish speaking individuals and those who would not ordinarily qualify for standard mortgage financing. Colony Ridge engages in high pressure sales tactics to convince the consumers to purchase a lot. Once at closing, even though Colony Ridge conducts the entire sales process in Spanish, consumers are rushed through English-only paperwork and provided with inadequate descriptions of the contract terms. Colony Ridge intentionally fails to disclose material terms of the contract in order to induce the consumers into signing the agreement. John Harris engages in false, misleading, and deceptive conduct by signing or otherwise approving virtually all Land Purchase Agreements and deeds, as is shown in the following example:

Grantor:

COLONY RIDGE DEVELOPMENT, LLC, a Texas Limited Liability Company by its Manager, T-REX MANAGEMENT, INC., a Texas Corporation

_____

JOHN HARRIS, PRESIDENT

34.     After the consumers have purchased the lot, El Norte POA, a mandatory property owners association, compels consumers to pay dues and fines at the threat of foreclosure without offering meaningful services to the residents of Colony Ridge.

35.     As previewed *supra*, Colony Ridge employs a multi-faceted set of schemes to mislead buyers and to profit from them. The various components of those schemes are set forth in detail in the following sub-sections.

**B.     JOHN HARRIS AND THE T-REX ORGANIZATIONAL STRUCTURE**

36.     John Harris and the entities comprising Colony Ridge Defendants have a unique structure. The following excerpt from company documents illustrates the overall Colony Ridge Defendants' hierarchy:



---

[7] This image represents a true and correct copy of a corporate organizational chart produced by Colony Ridge, Inc., Colony Ridge Development, LLC, Colony Ridge Land, LLC, and John Harris in response to a Civil Investigative

> **T-Rex Management, Inc.**
> The Manager of each of the subsidiaries. The company collects management fees from each LLC and pays all company employees. John Harris serves as President of T-Rex Management and owns this entity 100%. [8]

37.     At all times relevant to the unlawful conduct alleged herein, that organizational structure has been in effect, as have the roles of T-Rex and John Harris, as described *infra*.

**1)     T-Rex Runs LLCs**

38.     T-Rex serves two functions in the hierarchy. First, it is the actual manager of Colony Ridge Development, Colony Ridge BV, and Colony Ridge Land (the **"Colony Ridge LLCs"**). When the Colony Ridge LLCs undertake activities, including deceptive acts and other transactional activities, T-Rex directs the Colony Ridge LLCs to undertake those activities. The following signature blocks from routine Liberty County public filings illustrate T-Rex's operational authority—it is literally *the* manager:





---

Demand ("CID") issued by the Office of the Texas Attorney General on August 24, 2023. The image has been resized to fit this First Amended Complaint.
[8] *Id.*

COLONY RIDGE LAND, LLC, a Texas Limited
Liability Company
by its Manager T-Rex Management, Inc., a Texas corporation

By: _____
     John Harris, President

39.   Second, T-Rex is the true employer of all individuals nominally working at those Colony Ridge LLCs. Those Colony Ridge LLCs pay money to T-Rex, and in exchange, T-Rex's employees (and agents) then perform tasks on behalf of those Colony Ridge LLCs.

40.   The effect of this relationship between T-Rex and the Colony Ridge LLCs is twofold. First, culpability for all unlawful acts of T-Rex employees, contractors working under T-Rex's control, executives, and other agents is imputed to T-Rex. Second, because T-Rex is the actual operational manager of each of those LLCs, knowledge T-Rex possesses is imputed to *each and every* one of those LLCs. This includes knowledge of false, misleading, and deceptive conduct.

**2)   John Harris Runs and Manages the Operations of all Colony Ridge Defendants**

41.   On behalf of and as an agent of T-Rex, John Harris manages and operates the affairs of the aforementioned Colony Ridge LLCs. In addition to that managing agent role, John Harris is the Treasurer of all three Colony Ridge LLCs.

42.   His role in the remaining Colony Ridge Defendants is similar. John Harris owns and is the President of T-Rex. John Harris is the President of Colony Ridge, Inc. The signature blocks *supra* show John Harris actively serves in those entities' management, signing as "President" of T-Rex. In that same document, John Harris executed the document as "President" of Colony Ridge, Inc. (the holding company) as well.



43.    John Harris's involvement magnifies the effect of the previously-discussed relationship between T-Rex and the Colony Ridge LLCs.

44.    John Harris is culpable for all unlawful acts undertaken by himself, undertaken by his agents (of any type), including those under his control such as the aforementioned T-Rex employees. Furthermore, knowledge John Harris possesses is imputed to *each and every* entity for which John Harris is an officer. This includes knowledge of false, misleading, or deceptive conduct.

45.    Finally, all knowledge John Harris has is imputed to T-Rex. As a result, all of John Harris's knowledge is imputed to the Colony Ridge LLCs which T-Rex manages.

46.    The following chart summarizes the role of John Harris and T-Rex within the Colony Ridge Defendants:

| Entity Defendants | Chief Executive / Manager Running the Entity's Operations | John Harris's Operational Involvement in the Entity |
|---|---|---|
| Colony Ridge, Inc. | John Harris | John Harris is President |
| T-Rex | John Harris | John Harris is President |
| Colony Ridge Development | T-Rex (sole manager of this entity) | John Harris is: (1) President of T-Rex and (2) Treasurer of this entity |
| Colony Ridge BV | T-Rex (sole manager of this entity) | John Harris is: (1) President of T-Rex and (2) Treasurer of this entity |
| Colony Ridge Land | T-Rex (sole manager of this entity) | John Harris is: (1) President of T-Rex and (2) Treasurer of this entity |

### C.     DEFENDANTS' DECEPTIVE SOCIAL MEDIA ACCOUNT SCHEME

47.     First, to gain consumer information to lure consumers into transactions, Colony Ridge's digital sales marketing employees, at the direction of Colony Ridge and John Harris, create hundreds of fake social media accounts to interact with potential consumers. The fake accounts advertise individual lots around the Greater Houston area, attempting to create the image of a for-sale-by-owner structure. Once a consumer inquires about a lot online, Colony Ridge employees obtain the consumer's contact information and provide it to Colony Ridge's telemarketing department without the consumer's knowledge or consent.

48.     Former employees report that they were hired by Colony Ridge to create fake individual accounts on social media, falsely posing as legitimate sellers of land. Colony Ridge intentionally facilitates the creation and use of multiple fake social media accounts by providing each employee with SIM cards linked to different telephone numbers to avoid detection by social media platforms. That fraudulent behavior is necessary because many social media platforms limit the number of accounts associated with one phone number and using multiple SIM cards enables a single user to run a multitude of accounts from a single device.[9]

49.     In addition, Colony Ridge provides employees with fake names and unrelated photographs of land to create their fictitious online profiles. Colony Ridge also guides employees in taking photographs from the internet for purposes of creating fake listings statewide. These fake listings cast a larger net for potential buyers and facilitate the collection of contact information for people who were not even looking for lots around Colony Ridge Neighborhoods.

---

[9] For example, Facebook Community Standards limit each user to one Personal Account. Accounts are linked to phone numbers. SIM cards can be used to utilize multiple phone numbers on a single device, therefore enabling use of multiple Facebook accounts. *See* Facebook Policies and Reporting, About our Policies (2023), https://www.facebook.com/help/1735443093393986/?helpref=hc_fnav.

50.     For example, G.B.,[10] a former employee, reported that she worked as a digital marketing lead. Colony Ridge's employment records reflect G.B. began working as a digital marketing lead on November 08, 2021. She was managed by a woman named A.P. Colony Ridge mailed G.B. nine SIM cards when she began her employment (image below). Throughout November 2021, A.P., at the direction of Colony Ridge, instructed G.B. to use the cards to create fake accounts, create fake property listings, and obtain contact information from anyone who responded positively. A.P. explicitly told the employee to create listings in areas like Alvin and downtown Houston rather than in New Caney, where Colony Ridge is actually located. A.P. also provided G.B. with files of fake photos to use for profile pictures and property listing photos.



_____

[10] Pseudonyms are used throughout to refer to Colony Ridge's employees to prevent harassment and/or retaliation.



51.     Another former employee, J.H., began working for Colony Ridge in July of 2023 as a Digital Marketing Lead. J.H. worked in the Terrenos Houston building, located in New Caney, Texas. Colony Ridge's employment records corroborate her prior employment. When she began her job, J.H. went through training led by Colony Ridge. Training materials explicitly stated that employees could not say where the listed properties were located. Materials also contained instructions on keywords to use to gain interest online, how to find images on Google to use in the listings, and how to keep accounts active so they were not flagged as spam. Colony Ridge

encouraged employees to use online images of properties with grass and trees to create the illusion

that available properties were in substantially better conditions than actually exist at Colony Ridge.

52.     Colony Ridge required J.H. to make over 60 false online listings ***every day*** on fake

social media accounts. In fact, J.H. recounted witnessing Colony Ridge fire another employee for

failing to make 60 posts. Colony Ridge explicitly prohibited J.H. from including actual photos of

lots within Colony Ridge. Instead, Colony Ridge instructed her to use images of lots from Google

Images to add in her listings. Colony Ridge's policy and practice also forbade her from disclosing

that the actual seller of the lots listed was Colony Ridge. Colony Ridge only allowed her to post in

Spanish.

53.     Yet another former employee, M.V., began working for Colony Ridge in August of

2023. Colony Ridge employment records again validate her employment. She was specifically

assigned to posting on Facebook. Like G.B., M.V.'s manager was A.P. When M.V. began her

employment, Colony Ridge provided her with 60 fake Facebook accounts and told her to post 20-

25 times a day on each account. The accounts featured names and pictures of individuals,

maintaining the idea that the accounts were offering a sale of a lot by the account owner, not

Colony Ridge. M.V. was prohibited from mentioning Colony Ridge in these listings. When social

media users inquired about the fake listings, she would collect their contact information and send

it to Colony Ridge's management team without the consumers' knowledge or consent. M.V.

reported that Colony Ridge specifically advised her to target Hispanic social media users.

54.     Each of these instances of promoting land for sale utilizing the aforementioned

methods were discreet instances of Colony Ridge passing off real estate for sale as those of another.

*See* DTPA § 17.46(b)(1). These acts 1) resulted in the listing of not-for-sale land falsely

represented as being offered for sale; and 2) involved the false, misleading, or deceptive

representation of the identity of the purported person/entity offering land for sale, which in reality was one or more of the defendants comprising Colony Ridge. *See* DTPA § 17.46(a) (outlawing "false, misleading, or deceptive acts or practices").

### D. DEFENDANTS' MISREPRESENTATIONS ABOUT THE EXISTENCE OF BASIC CITY SERVICES

55.     Colony Ridge markets its lots through a multitude of websites and social media outlets. Colony Ridge operates over 70 websites and 80 social media pages, primarily in Spanish, dedicated to advertising the Colony Ridge development. Colony Ridge advertises, or directs others to do so on its behalf, minimal financing requirements for a consumer to own land in the United States.

56.     These advertisements allege, among other things, that: a) the lots include all city services, such as water, electricity, and drainage; b) that "[t]he Land Comes with Services . . . [and] … [C]ity public services include sewer and water that helps you save between twenty and twenty-five thousand dollars over a septic system."; and (c) that lots are "move in ready." All of these statements are false. Colony Ridge misleads consumers into believing that their lots are ready for mobile homes or home building, when in fact, that is not the case. Instead, consumers are responsible for spending thousands (even tens of thousands) of dollars to set up city services because access, contrary to Colony Ridge's representations, is not readily available. Further, many consumers must wait *over a year* for city service installation, belying Colony Ridge's claims that lots are readily accessible for all city services.

57.     Multiple consumers have stated that Colony Ridge represented that lots have city services available, without ever mentioning the need to incur related expenses. Colony Ridge falsely informed other consumers that total installation fees would cost approximately $200, and that Colony Ridge provides all the necessary connections.

58.     Colony Ridge's training materials instruct employees to mislead consumers that lots either have city services or easy access to them. Colony Ridge clearly instructs employees to inform potential buyers that the prices for lots include city services, such as water and sewage. This fact is material to consumer decision-making because the availability of city services can save consumers the tens of thousands of dollars they would have to spend on an alternative, such as a septic system. And some of Colony Ridge's training materials also provide deceptive rebuttal points for apprehensive consumers. For example, one of the training materials titled "Refutaciones" instructs employees to tell consumers who are concerned that the lots are too expensive that "[l]os precios que le damos incluyen servicios públicos" (the prices that we offer include public services). Another document titled "GUIA PARA DAR INFORMACION Y AGENDAR CITA" also states that "[l]os [t]errenos [v]ienen [c]on [s]ervicios" (the properties come with services).

59.     Colony Ridge also makes deceptive claims regarding the availability of city services on their social media pages. To provide just a few illustrations, on October 19, 2021, the Colony Ridge Communities Instagram account posted that a new home in Colony Ridge comes "with access to water, electricity, and drainage." On August 30, 2023, the Colony Ridge Commercial Facebook account boasted "city water & sewer included on all commercial reserves." And Terrenos Houston's Facebook page also makes numerous claims that their lots have ready access to city services (light, water, and drainage) that only require low connection fees, including a post from August 10, 2023, that asked, "did you know that our lands include access to city services (water, light, and drainage)?" And another post from August 30, 2023 claimed "ready plots with city services."

60. These claims are false; contrary to Colony Ridge's numerous representations, consumers must bear the costs associated with the installation of certain infrastructure, such as transformers, electricity poles, meters, and other connection costs of basic city services to their lots.

61. Many consumers were unaware of *any* costs associated with city service installation to their lots since Colony Ridge represented at the time of sale that consumers' only responsibility was to call the city services company to set up said services. Other consumers were under the impression, based on Colony Ridge's representations, that the only cost to acquire city services were those associated with the "hookup" of the services and setting up the electric account (*i.e.*, account connection fees).

62. To gain access to city services, consumers must pay upwards of twenty thousand ($20,000) dollars and will likely not gain access to such services until months or years later than Colony Ridge claims.

63. In September 2022, consumer S.C.[11] purchased a lot in the Santa Fe subdivision from Colony Ridge Defendants and John Harris and had to pay approximately eight thousand dollars ($8,000) just to get sewer lines connected to her lot.

64. Despite Colony Ridge representing that city services were on the property, another consumer, M.B., who purchased a lot in the Santa Fe subdivision from John Harris and Colony Ridge Defendants in July 2020 paid approximately twenty thousand dollars ($20,000) to install water, electricity (including an electrical pole), and sewage on the lot.

65. When consumers are in the process of purchasing a lot from Colony Ridge, they interact with numerous Colony Ridge employees. For example, a one-page Colony Ridge

---

[11] Consumers' initials are used throughout Plaintiff's First Amended Complaint to prevent harassment and/or retaliation.

document titled, "APPLICATION," lists the employees a consumer interacts with, including: sales rep; sales aid; telemarketer; digital marketing manager; pre-closer; final closer; and social media.

66.     For example, consumer M.B.'s application lists Ivonne P. as digital marketing manager, Lucia M. as pre-closer, Salvadore C. as telemarketer, Nisibel S. as social media, and is signed by Jose L. as a sales representative. It is likely that multiple Colony Ridge employees misrepresent the availability of city services to a consumer throughout the purchasing process.

67.     Colony Ridge keeps track of all employees involved in sales transactions for purposes of internal accounting and payment of sales commissions. As such, it is reasonable to believe that Colony Ridge maintains readily available information from which it can identify the specific employees who made the types of misrepresentations alleged herein on a transaction-by-transaction basis.

68.     Consumers were also unprepared for the significant delay to gain city service access. Some consumers have waited over a year for city services, frustrating their ability to place a mobile home or begin the home building process.

69.     For instance, Colony Ridge represented to consumer J.R., who purchased a lot in the Santa Fe subdivision from John Harris and Colony Ridge Defendants in June 2021, with sales representative Rodrigo R. listed on the "sales card information" document, that the lot would be ready for J.R. to move onto by December 2021, but the lot was not ready in March 2023, almost *two years* later.

70.     In October 2021, another consumer, G.Z., paid the full amount to John Harris and Colony Ridge Defendants for his lot in the Santa Fe subdivision. G.Z. was told that he could begin occupying the property within a year, however, as of January 2024, G.Z. was still unable to occupy or begin building a structure on the lot.

71.     Consumers also indicate that Colony Ridge has consistently and continuously deprived consumers of any meaningful use of their lots due to Defendants' lack of infrastructure in the undeveloped area. Defendant El Norte POA and the Liberty County Local Subdivision Rules require that city services and culverts are installed before a consumer can build a structure and/or move onto their residential lot(s). Despite the restrictions imposed by El Norte POA and the Liberty County Local Subdivision Rules, Colony Ridge directs their employees to omit or misrepresent the estimated costs and fees associated with the connection and installation of city services and drainage culverts at the time of sale. This causes consumers to incur additional unforeseen expenses, like the need for replacement housing.

72.     In sum, even though Colony Ridge advertises that its lots are readily accessible and include all city services, the reality is nothing of the sort. Consumers must pay thousands of dollars more than anticipated, must frequently wait over one year for the installation of basic services, and are unable to occupy or begin building upon their lots. For these reasons, John Harris and Colony Ridge Defendants knew these statements were false or acted with reckless disregard for their truth when made.

**E.     DEFENDANTS' DECEPTIVE PRE-CLOSING AND CLOSING REAL ESTATE PROCESS**

73.     Colony Ridge's deceptive scheme then proceeds into the pre-closing and closing phases.

74.     During the sales process, salespersons employed by Colony Ridge provide every consumer with an inventory sheet that includes the legal description of each lot, the price, the applicable interest rate, and term of the loan. The inventory sheet is non-negotiable.

75.     To pressure consumers into a seller-financed real estate transaction, the salespersons create the false impression of scarcity of residential lots. On at least one known

occasion, a salesperson contacted consumer G.S. to inform her that the price of the lot she toured two weeks prior would be increasing almost 50% unless she purchased the lot immediately.

76.     After the consumer selects a residential lot from the inventory sheet (with the associated and non-negotiable price, interest rate, and term), the salesperson completes a sales card and requests two forms of identification from the consumer. The salesperson then submits the sales card and two forms of identification to a licensed Texas notary public employed by Colony Ridge (the "notary" or "notaries"), most or all of which are not authorized to originate loans in the State of Texas (the "pre-closing").[12]

77.     The notaries enter the consumer's information into an origination software created and maintained by Loan Originator Services LLC (the "Origination Software").

78.     The Origination Software generates the pre-closing documents, including an Application for Financing, a Mortgage and Loan Analysis, and a Land Purchase Agreement (collectively, the "pre-closing documents"). The pre-closing documents include multiple pages of small print—all in English.

79.     As discussed *supra*, however, Colony Ridge principally targets *Spanish* speakers, including many who do not speak English at all. To ostensibly bridge the gap between Spanish speakers and the English pre-closing documents, Colony Ridge's notaries provide consumers with an oral "summary" of the pre-closing documents in Spanish. But the notaries regularly omit key terms or make misrepresentations. For example, consumers are promised that the residential lot(s) they finance through CR Development will be ready to build a structure on and/or occupy by the delivery date stated in the pre-closing documents, when in fact, such residentials lots are not ready for the consumer to build a structure on and/or occupy by said delivery date.

---

[12] Colony Ridge and the notaries advertise to consumers that the notaries are "notarias" or "notarios" in Spanish, in violation of § 406.017 of the Texas Notary Public Act.

80.     During the pre-closing, consumers execute a Land Purchase Agreement, and the notaries collect an earnest money fee and a non-refundable option fee from consumers. The Land Purchase Agreement specifically states the following: "Buyer speaks Spanish as a primary language. This contract was explained to Buyer's satisfaction in Buyer's preferred language." This is the only document provided to consumers that purports to provide Spanish speakers with any kind of translation.

81.     Approximately one week after pre-closing, Colony Ridge provides to the buyer a Deed of Trust, Warranty Deed with Vendor's Lien, and a Promissory Note (collectively, the "closing documents"). The closing documents include multiple pages of small print in English.

82.     At closing, the notaries provide consumers with an oral "summary" of the closing documents in Spanish, again regularly misrepresenting or omitting key terms and imposing an arbitrary time limit of approximately 15 to 20 minutes to review the closing documents and sign.

83.     As described above, salespersons and notaries speak Spanish with consumers during the entire sales process, including the pre-closing and closing process. However, the pre-closing and closing documents are only provided to the consumers in English. Upon information and belief, no one at Colony Ridge's offices is fully qualified to comprehensively translate, interpret, and/or explain real estate contract provisions in English or Spanish, and at least one "notaria" or "notario" is not fully literate in English.

84.     Colony Ridge does not attach any translation to consumers of the pre-closing documents (including the Land Purchase Agreement) or the closing documents.

85.     Colony Ridge also does not furnish a Property Report pursuant to §§ 1703 and 1707 of ILSA to consumers, either before any contract or agreement is signed, or at any other time.

29

86.     And Colony Ridge compounds the misrepresentations at closing by informing concerned consumers that Colony Ridge will take back lots from buyers who can no longer afford their mortgage payments. At the time of sale, Colony Ridge provides consumers a document with the telephone number to call when "[r]eturning a property." The reality is that Colony Ridge has a pattern and practice of telling consumers who want to return their lots (due to hardship or other reasons) that the *consumer is responsible* for finding someone to assume their mortgage—i.e., returns are not allowed.

***Deceptive Conveyance Provisions***

87.     The allegations in this subsection pertain to (1) substantially all of Colony Ridge's Land Purchase Agreement and other transaction documents and (2) substantially all of Colony Ridge's deeds, which, upon information and belief, have remained substantially the same since Colony Ridge's inception. Similarly, upon information and belief, the following associated unlawful conduct has occurred in substantially the same way since Colony Ridge's inception.

88.     Colony Ridge's Land Purchase Agreements are rife with deceptive provisions that further its deceptive business model. The contracts have a deceptive delivery provision, contain unlawful DTPA waivers, and misrepresent which party is responsible for property taxes during the first year of ownership. These contracts are used for all, or substantially all, consumer lot purchases. John Harris signs virtually every one of those deceptive contracts, resulting in thousands of consumer victims. The challenged provisions were knowingly false and/or reckless when made, insofar as Defendants did not intend to perform or knew or recklessly disregarded the fact that performance would not occur at the time of contract based on past experience.

89.     Furthermore, as part of the deceptive business model, John Harris engages in a second category of deceptive conduct by signing virtually every deed. Despite getting these John-Harris-signed deeds, consumers are not allowed to occupy their lots.

90.     First, the delivery provision in the standard contract is unambiguous: "The possession of the property will be delivered to the Buyer as of the date of closing." Colony Ridge does nothing of the sort and knows of this fact at the time of the contract. In reality, Colony Ridge forbids consumers from developing their lots, for a period of generally one to two years, and effectively prohibits consumers from accessing the land for any purpose, even to perform acts antecedent to and required for home construction commencing, such as clearing illegally-dumped trash or debris, leveling, or putting in culverts.

91.     Second, these contracts contain an unlawful DTPA waiver. The waiver provision states, "Buyer acknowledges and stipulates that Buyer is not relying on any representation, statement, or other assertion with respect to the Property condition." On paper, this waiver purports to allow Colony Ridge to avoid a whole range of consumer claims, ranging from fraud to DTPA-based claims. However, a consumer contract may not contain a waiver of rights available under the DTPA, such purported waivers are void. DTPA § 17.42(a). While inherently deceptive, this contract clause implicates another DTPA provision which outlaws representing that an agreement confers or involves rights, remedies, and obligations which it does not have, or which are prohibited by law. DTPA § 17.46(b)(12).

92.     When Colony Ridge provides contracts containing this unlawful waiver to a consumer, Colony Ridge misrepresents that under the contract, consumers' rights under the DTPA are waived, rights which cannot be waived. Furthermore, it is false, misleading, and deceptive to

include a DTPA waiver in a contract. Accordingly, this waiver provision is a *per-se* DTPA violation.

93.    Thirdly, Colony Ridge contracts falsely state that the property taxes "will be prorated as of the date of closing . . ." However, thousands, if not virtually all, Colony Ridge consumer deeds provide the opposite. At closing, Colony Ridge presents consumers with deeds stating (1) that customers agree to pay *all* taxes for the current year and (2) that consumers are liable for any increased tax liabilities for prior years, such as those caused by factors outside of their control, such as changes in "land usage." When consumers sign these deeds, they are bound by the deeds' obligation to pay *all* of the taxes.

94.    In conclusion, Colony Ridge lot contracts are full of deceptive provisions that serve no purpose but to further Colony Ridge's deceptive scheme.

**F.    FLOODING AT COLONY RIDGE DEVELOPMENT**

95.    The Colony Ridge Development is subject to repeated flooding and does not contain sufficient infrastructure to support the estimated 40,000 to 50,000 residents who currently reside in the Development.[13] In fact, CR Development has been accused of causing flooding within Colony Ridge Neighborhoods due to the failure to adhere to drainage standards and regulations, which resulted in improper drainage construction. *See City of Plum Grove v. Colony Ridge Development, LLC*, Cause No. CV2016249, 253rd Judicial District Court, Liberty County; *Michael Wayne Shrader v. Colony Ridge Development, LLC et al.*, Cause No. 22DC-CV-00865, 253rd Judicial District Court, Liberty County.

---

[13] *See Recent storms highlight flood risk in Houston-area development Colony Ridge*, Jhair Romero (May 7, 2024), https://www.houstonchronicle.com/news/houston-texas/environment/article/colony-ridge-flood-risk-storms-19436012.php.

96.     The Texas Commission on Environmental Quality has conducted more than 50 investigations at the development. The investigations have addressed issues with wastewater and storm water in the development of the lots sold by Colony Ridge and John Harris.

97.     Colony Ridge and John Harris hire construction companies to develop the lots in the Colony Ridge Neighborhoods. Colony Ridge and John Harris, as the owners of the property, are required to comply with all storm water and wastewater requirements of the State of Texas.

98.     The construction companies operating under the direction of Colony Ridge and John Harris have failed to properly implement and/or adhere to Storm Water Pollution Prevention Plans (SWPPP). These plans include, but are not limited to, erosion and sediment control.

99.     Failure to follow SWPPP requirements led to the repeated flooding of lots. Additionally, Colony Ridge has failed and continues to fail to notify consumers about the extent and occurrence of flooding in the Development.

100.    Consumers purchase the lots with no knowledge about the occurrence and extent of flooding. Colony Ridge's salespersons never mention this information or provide any written notice to consumers regarding periodic flooding to consumers.

101.    It is only upon purchasing a lot that consumers learn that their lot and the Development become flooded during rainstorms on account of Defendants' failure to follow applicable laws and regulations.

## G.     FALSE, MISLEADING, OR DECEPTIVE CONDUCT RELATED TO PROPERTY OWNERS' ASSOCIATIONS

102.    Defendants also systematically misled purchasers about the nature and function of the various property owners' associations ("POAs") that Defendants had established, oversaw, and operated ostensibly for the benefit of Colony Ridge residents and consumers. First, beginning in 2016, Defendants engaged in deceptive acts calculated to create the false impression that the initial

neighborhood-specific POAs established by Defendants—each one corresponding to a specific Colony Ridge neighborhood—*continued* to exist and operate solely for the benefit of their respective local communities. In reality, Defendants shuttered and dissolved the neighborhood-specific POAs in favor of a single, unified POA over the *entire development*—Defendant El Norte POA—that was stripped and devoid of the neighborhood-level attributes that purchasers found desirable. Second, Defendants created the false impression that the POAs would make financial expenditures to meet the *present* needs of the neighborhoods' property owners, and for the immediate benefit of said property owners.

103.    Starting in 2011, John Harris and T-Rex—with CR Development or CR Bella Vista—formed five local POAs, one for each of the five neighborhoods located within the Colony Ridge development. Defendants understood and appreciated that potential purchasers valued the existence of a neighborhood-level POA responsible for various activities in their respective local community, to the exclusion of other Colony Ridge neighborhoods. For instance, between 2011 and 2017, John Harris chaired numerous Boards of Directors meetings of the neighborhood-specific POAs at which the local residents actively participated and advocated for the needs of their specific neighborhoods, including, but not limited to, improved drainage, street lighting, animal control, neighborhood watches, theft and resident safety, emergency response services, and recreational amenities. In other words, purchasers desired the presence of a local POA funded by their neighborhoods' residents and empowered to make expenditures to maintain and improve their neighborhood (and only that neighborhood)—and in which purchasers had the ability to participate meaningfully in the POA on matters solely of concern to their neighborhood. In short, Defendants cultivated the belief that local POAs provided lot owners important neighborhood-specific benefits, to the exclusion of lot owners elsewhere.

104.    However, in 2016 Defendants hatched and executed a plan that sharply departed from this historical practice, dissolving all five then-existing neighborhood-specific POAs and combining them into a single POA—Defendant El Norte POA—vested with responsibility for the *entire* Colony Ridge development. By creating and operating this larger, all-encompassing POA, Defendants intentionally destroyed the benefits ostensibly provided by the neighborhood-specific POAs that purchasers and owners have valued: a local community POA funded only by owners located in that Colony Ridge neighborhood and empowered to use those funds to pay for maintenance and improvements in that community and only that community.

105.    Further undermining these benefits, Defendants transferred all funds held by the neighborhood-specific POAs, to Defendant El Norte POA. As a result, these commingled funds— and the annual dues collected and commingled thereafter—were no longer restricted to neighborhood-specific expenditures. Worse, Defendants did not even bother to limit expenditures made by El Norte POA for the benefit of each Colony Ridge neighborhood in proportion to the dues that each contributed.

106.    Pursuant to this "merger" scheme, between 2017 and 2020, Defendants transferred highly valuable, community real property owned by each of neighborhood-specific POAs on behalf of their members to Defendant El Norte POA. Even worse, Defendants (specifically the nonprofit El Norte POA with the involvement of John Harris, T-Rex, CR Development, CR Bella Vista, and CH&P) then secretly conveyed this community property to one or more third parties for little or no consideration, deleted the corresponding assets from and did not record the transfers on El Norte POA's financial statements and reports, and misrepresented the POA's finances in member meetings. This series of transactions puts the lie to any claim that El Norte POA somehow provided neighborhood-level benefits to residents. Ultimately, Defendants' accounting

35

manipulation misrepresented the POA's financials, and avoided inquiry from POA members and others.

107.    In addition, Defendants restricted the ability of owners to participate in the direction and governance of Defendant El Norte POA to levels *far lower* than afforded in the neighborhood-specific POAs. For instance, in contrast to the neighborhood-specific POAs, Defendants indefinitely imposed a so-called "development period" where Defendants operated under the belief that they exercised absolute and complete control of the nonprofit El Norte POA, effectively eliminating participation allowed in the earlier neighborhood-specific POAs. Indeed, immediately following the formation of El Norte POA and continuing to the present, Defendants have effectively destroyed any valued participation rights on a systematic basis. Among other acts inconsistent with their representations to purchasers and members, Defendants granted themselves the exclusive authority to appoint, elect, remove, or replace any corporate officer or member of the Board of Directors of El Norte POA for *any* reason, and vested themselves with the perpetual and unilateral authority to veto *any* decisions or actions of the members and property owners.

108.    To conceal the fact that the material, localized benefits of the neighborhood-specific POAs had been destroyed by consolidating them into El Norte POA, and to frustrate owner-members from raising concerns over disparate treatment, Defendants knowingly created the false impression that the neighborhood-specific POAs continued to exist. Defendants deceived owners on a large scale through various types of misconduct. Notably, *to this very day* Defendants falsely represent that the dissolved neighborhood-specific POAs continue to exist and operate, on multiple Colony Ridge affiliated websites, including on the neighborhood-specific webpages on the main Colony Ridge site and the webpage where owners pay their annual dues.[14]

---

[14] *See, e.g.*, Defendant CR Land's Bella Vista Webpage, https://www.colonyridge.com/subdivisions/bella-vista/ (deceptively promoting "Liberty Bella Vista Property Owners Association" as a feature of the neighborhood).

109.     In addition, shortly after terminating the neighborhood-specific POAs, Defendants, including Defendant CH&P, registered the business names of the terminated entities as assumed names for Defendant El Norte POA with the Texas Secretary of State, in order to facilitate Defendant El Norte POA masquerading as the neighborhood-specific POAs. Further, Defendants' conduct made it possible to misdirect dues that deceived members continued to pay to the accounts of the neighborhood-specific POAs, into El Norte POA's coffers without incident. Taken in their totality, the facts and circumstances alleged herein more than reasonably support the conclusion that Defendants—including Defendant CH&P—created the false impression that purchasing and owning property in a Colony Ridge neighborhood came with a local POA that *provided targeted benefits for that community*—thereby enabling El Norte POA to operate without the burden of disruption and any public outcry from property owners.

110.     Separate and apart from the above deceptive conduct, Defendants created the false impression that the POAs made and would make financial expenditures towards improvements needed presently in the community and would not primarily retain funds for purposes of future expenditures on maintenance. For instance, in publicly filed governing documents, Defendants falsely represented that El Norte POA would "levy [a]ssessments to promote the recreation, health, and welfare of the residents in the [respective neighborhood], to fund operating expenses of [Defendant El Norte POA], and to improve and maintain the Common Areas [within the respective neighborhood]."

111.     What's more, Defendant CH&P painted a rosy picture of El Norte POA's role in the community. In flyers distributed to new owner-members at all relevant times and on the POA's website, CH&P emphasized that El Norte POA existed to "protect[] common property, members, and overall property value" and to that end collected membership dues to "maintain . . . common

property." And on El Norte POA's website, CH&P falsely promotes to current and prospective purchasers that opportunities exist to serve on POA committees to "represent[] the opinions of most of the community."

112. Reality, however, does not comport with Defendants' representations. Contrary to their stated purpose, Defendants have used the POAs to collect millions of dollars in dues annually to subsidize "neighborhood" or "maintenance" services in the *future* for undeveloped additions to Colony Ridge. According to former El Norte POA board member L.T., although the POA collected dues to provide neighborhood services, the nonprofit POA routinely denied members' pleas for minor common area improvements—including local improvements such as a park in the Camino Real neighborhood. Moreover, there are no resident POA committees to meaningfully participate in and represent the community because, as alleged above, Defendants have systematically prevented actual POA participation, and have asserted the erroneous right to veto any action of any resident committees for any reason.

113. Defendants' representations that El Norte POA made expenditures to "protect" or "maintain" community property were false because, as alleged above, Defendants had previously conveyed the real property owned by El Norte POA (and previously held by the neighborhood-specific POAs) to one or more third parties for nominal or no consideration. In other words, El Norte POA owns *no* real property on behalf of its residents that it could possibly protect or maintain. In short, Defendant El Norte POA deceives purchasers paying dues under the pretense that the POA would provide immediate benefits to their neighborhoods when, in truth, El Norte POA merely serves to feed Defendants' expansionist goals for the future.

**H.     EXAMPLES OF DEFENDANTS' FALSE, DECEPTIVE, AND MISLEADING BUSINESS ACTS AND PRACTICES**

114.     As described above, since at least 2015, Defendants have misled and deceived consumers with predatory marketing tactics, including promises of cheap, ready to build lots with available city services. Thousands of consumers have relied on Defendants' false, deceptive, and misleading statements in deciding to purchase lots from Defendants.

115.     While discovery has not yet begun in this matter, Plaintiff has already identified numerous consumers who have been misled and deceived by Defendants' unlawful business practices. The information in this section contains ten specific examples of consumers who have relied on Defendants' false representations, and which further support Plaintiff's claims. [15] This is not an exhaustive list of all consumers who have been misled and deceived, but instead is the tip of the iceberg of evidence demonstrating Defendants' unlawful business practices.

**1)  Consumer M.B. (Example Transaction No. 1):**

116.     On or about July 8, 2020, consumer M.B. purchased and financed a lot from Colony Ridge and John Harris for approximately $51,560 at an interest rate of 12.9% for 20 years.

117.     During the sales process, John Harris's and Colony Ridge Defendants' agents and representatives, including salespersons Jose L. and Lucia M., told M.B. that city services/utilities were included with the lot being purchased and that she would need to wait approximately three months before being able to place a mobile home and/or build a home on the lot.

118.     It was only after closing on the lot that M.B. discovered that the lot did not include any city services/utilities.

---

[15] As described above, consumers' initials are used throughout Plaintiff's First Amended Complaint to prevent harassment and/or retaliation.

119.    M.B. was forced to pay approximately $20,000 to have the water, electricity, and sewage connections installed to her lot.

120.    M.B. also had to wait approximately eight months from the closing date for John Harris and Colony Ridge Defendants to install the necessary infrastructure before she could place a mobile home or begin building a home on the lot, even though she was told at the time of the transaction that she would only have to wait three months. Accordingly, M.B. was deprived of any meaningful use of her lot for approximately eight months.

### 2)   Consumer M.A. (Example Transaction No. 2):

121.    On or about November 16, 2018, consumer M.A. purchased and financed a lot from John Harris and Colony Ridge Defendants in the Camino Real subdivision of Colony Ridge for approximately $39,000 at an interest rate of 12.99% for 10 years.

122.    John Harris's and Colony Ridge Defendants' salespersons, Sandra G. and Amanda G., falsely informed M.A. that she would be able to use the water meter that was located on the lot she was going to purchase.

123.    Sandra G. and Amanda G. failed to disclose to M.A. that the water meter on the lot belonged to the consumer who owned the adjacent lot, and that M.A. would need to incur additional expenses to remove the water meter from her lot and purchase a new one.

124.    At closing, Amanda G. also signed a "closer's certification" in which she affirmatively represented to M.A. that the lot had electrical, water, and sewage service available to hook up for costs of less than $1,000.

125.    Despite Colony Ridge Defendants' verbal and written representations, M.A. discovered after entering into the transaction that a) the water meter belonged to her neighbor; b) that she would need to incur additional expenses to remove her neighbor's water meter from her

lot; and c) that she would need to purchase a new water meter and place it on the easement just to obtain water service. M.A. would need to incur expenses of at least $3,000 just to obtain water service.

126.    As a result of these unforeseen and undisclosed expenses, M.A. was unable to move onto the lot she purchased, and Colony Ridge Defendants ultimately foreclosed on her lot.

### 3) Consumers A.H. and H.R. (Example Transaction No. 3):

127.    In September 2020, consumer A.H. (H.R.'s partner), purchased and financed a lot in the Santa Fe subdivision of Colony Ridge from John Harris and Colony Ridge Defendants for approximately $30,000 at an interest rate of 12.9% for 20 years.

128.    At the time of purchase, John Harris' and Colony Ridge Defendants' salesperson, Raul R., represented to A.H. and H.R. that there would be no costs for connecting city services/utilities to the lot.

129.    Much to their surprise, the lot did not have any utilities and A.H. and H.R. were forced to pay to install electrical, water, and sewage services.

130.    At the time of purchase, Raul R. also informed A.H. and H.R. that natural gas would be available on the lot. This also turned out to be false and required A.H. and H.R. to invest in electrical appliances.

131.    John Harris's and Colony Ridge Defendants' salespersons also informed A.H. and H.R. that they would not need flood insurance because the subdivision does not flood. This was also false.

132.    Raul R. also told A.H. and H.R. that Colony Ridge Defendants would authorize them to place a mobile home and/or begin building on their lot within six months. Until then, A.H.

and H.R. were not allowed to clear the land, place a mobile home, or build any structures on the lot they purchased.

133.    Contrary to John Harris's and Colony Ridge Defendants' salesperson's representations, John Harris and Colony Ridge Defendants restricted A.H.'s and H.R.'s ability to install a mobile home or build on the lot for approximately one year. John Harris and Colony Ridge Defendants finally authorized A.H. and H.R. to place a mobile home on their lot in late 2021.

134.    A.H. and H.R. were finally able to move a mobile home onto their lot in February of 2022. However, A.H. and H.R. were deprived of any meaningful use of their lot for approximately one year from the date of closing.

135.    At the time of sale, Colony Ridge Defendants also informed A.H. and H.R. that the area would become more urbanized with streetlights and roads, and that the POA would provide services and enforce regulations to keep the developments "respectable." However, as of May 2024, John Harris's and Colony Ridge Defendants' subdivisions continue to lack streetlights, the roads remain in poor condition, and regularly flood.

**4)  Consumer M.M. (Example Transaction No. 4):**

136.    On or about June 28, 2022, consumer M.M. purchased and financed two lots from John Harris and Colony Ridge Defendants in the Santa Fe subdivision of Colony Ridge for approximately $83,000 at an interest rate of 12.9% for 20 years.

137.    M.M. does not speak or read English. At closing, John Harris's and Colony Ridge Defendants' salespersons failed to explain each page of the financing and closing documents to M.M. Instead, John Harris's and Colony Ridge Defendants' salespersons rushed M.M. through the sales process and only explained to M.M. where she had to sign.

138.    During the sales process, John Harris's and Colony Ridge Defendants' salesperson, Jorge T., made several misrepresentations to M.M., including that the lots purchased would be ready for her to live on by June 2023.

139.    In fact, John Harris and Colony Ridge Defendants restricted M.M. from accessing the lots by requiring that she schedule an appointment with Colony Ridge Defendants even just to view the lots she purchased.

140.    During the sales process, M.M. asked Jorge T. about flooding in the area. Jorge T. eased M.M.'s concerns and informed her that the lots do not flood.

141.    At the time of sale, Colony Ridge Defendants also informed M.M. that if she could not make payments on her loan, Colony Ridge Defendants would assist her and help her transfer the lot to someone else and that her credit score would not be affected.

142.    Despite her inability to access the lots she purchased, M.M. continued to make loan payments to Colony Ridge Defendants. Due to health reasons, M.M. had to stop working and defaulted on her loan in 2023.

143.    M.M. contacted Jorge T. to try to make payment arrangements on her loan. Jorge T. informed M.M. that all he could do to help her was sell her a different lot within John Harris's and Colony Ridge Defendants' development.

144.    On or about August of 2023, Colony Ridge Defendants foreclosed on M.M.'s two lots which she was never able to access.

**5)  Consumer C.V. (Example Transaction No. 5):**

145.    On or about July 2, 2022, consumer C.V. purchased and financed a lot from John Harris and Colony Ridge Defendants in the Santa Fe subdivision of Colony Ridge for approximately $39,500.

146.    At the time of sale, John Harris's and Colony Ridge Defendants' salespersons informed C.V. that the lot would be available for him to place a mobile home and/or build a structure on later that year (in 2022).

147.    Approximately four months after he purchased the lot from John Harris and Colony Ridge Defendants, C.V. contacted John Harris's and Colony Ridge Defendants' salesperson and was informed that the lot was still not available for him to place a mobile home and/or build a structure on. C.V. was told the same thing for about two years.

148.    John Harris's and Colony Ridge Defendants' salesperson claimed there was an "issue with the city" that prevented C.V. from placing a mobile home and/or building a structure on the lot.

149.    Despite Colony Ridge Defendants' initial representations, C.V. was deprived of any meaningful use of the lot for nearly two years.

150.    Despite Colony Ridge Defendants' misrepresentations to C.V. at the time of the transaction, C.V. continued to pay the POA dues and make timely loan payments to Defendants.

151.    Approximately two months ago (around the time Plaintiff filed its Complaint (ECF No. 1)), Colony Ridge Defendants informed C.V. that he would finally be able to move a mobile home or build a structure on his lot.

152.    C.V. is currently assessing the costs and steps that will be needed for him to begin building a home on the lot but was informed by John Harris's and Colony Ridge Defendants' salesperson at the time of the transaction that the costs to connect the necessary city services/utilities to the lot would not exceed $1,200.

153.    During the two years C.V. was deprived of any meaningful use of the lot, C.V. offered to take title to a different lot of similar value. Colony Ridge Defendants refused C.V.'s

offer. Instead, Colony Ridge Defendants informed C.V. that he would be in breach of contract if he stopped making loan payments and that his lot would be foreclosed.

154.     C.V. purchased a lot from John Harris and Colony Ridge Defendants in 2022 with the understanding that he would be able to place a mobile home and/or begin building a home on the lot that same year.

155.     As a result of John Harris's and Colony Ridge Defendants' failure to provide C.V. with any meaningful use of his lot, C.V. was forced to incur the unexpected expense of having to rent an apartment for over two years. These unexpected expenses have placed a significant financial burden on C.V.

**6)  Consumer Y.H. (Example Transaction No. 6):**

156.     On or about September 29, 2021, consumer Y.H. purchased and financed a lot in the Santa Fe subdivision from John Harris and Colony Ridge Defendants for approximately $29,540.

157.     At the time of purchase, John Harris's and Colony Ridge Defendants' salespersons informed Y.H. that all utilities would be included, and that the area does not flood.

158.     At the time of purchase, John Harris's and Colony Ridge Defendants' salespersons also informed Y.H. multiple times that she would be able to begin building a home on the lot by September 2022. Until then, Y.H. was not allowed to begin building a home on the lot.

159.     After September 2022, Y.H. contacted John Harris's and Colony Ridge Defendants' salesperson multiple times and was informed that she was not allowed to begin building a home on the lot. Y.H. was told the same thing for nearly two years.

160.    On or about April of 2024, John Harris and Colony Ridge Defendants finally authorized Y.H. to begin building a home on the lot she purchased in September of 2021. Y.H. had to wait nearly three years from the date of closing to be able to use her lot.

161.    During the nearly three years Y.H. was deprived of any meaningful use of her lot, Y.H. continued to make loan payments to Colony Ridge Defendants.

162.     As a result of John Harris's and Colony Ridge Defendants' failure to provide Y.H. with any meaningful use of her lot, Y.H. was forced to incur the unexpected expense of having to rent an apartment for nearly three years. These unexpected expenses have placed a significant financial burden on Y.H.

163.    Y.H. purchased the lot from John Harris and Colony Ridge Defendants with the intention of building a home on the lot by September 2022. Had Y.H. known at the time of the transaction that she would not be able to begin building a home on the lot until mid-2024, she would not have purchased a lot from John Harris and Colony Ridge Defendants.

### 7) Consumer W.G. (Example Transaction No. 7):

164.    On or about May 29, 2021, consumer W.G. purchased and financed four lots in the Santa Fe subdivision from John Harris and Colony Ridge Defendants for approximately $175,680.

165.    At the time of sale, John Harris's and Colony Ridge Defendants' salesperson, Arely M., represented to W.G., verbally and in writing, that the lots would be available for him to access and build on by Winter 2021.

166.    As of May 2024, John Harris and Colony Ridge Defendants have not released the lots to W.G., which he purchased three years ago.

167.    John Harris and Colony Ridge Defendants have also failed to provide the necessary infrastructure necessary to release the lots to W.G., despite John Harris's and Colony Ridge Defendants' salespersons representations to W.G. at the time of sale.

168.    For approximately two years, W.G. continued to submit loan payments and POA dues to Colony Ridge Defendants for the four lots he purchased nearly three years ago and which he cannot access.

**8) Consumer F.M. (Example Transaction No. 8):**

169.    On or about March and June of 2015, consumer F.M. purchased and financed two lots from John Harris and Colony Ridge Defendants in the Bella Vista subdivision of Colony Ridge for approximately $62,400.

170.    At the time of sale, F.M. was told by John Harris's and Colony Ridge Defendants' salespersons, Eduardo P. and Sandra G., that the lots included the necessary utilities. F.M. was not told that she would have to pay to get the utilities installed on her lot.

171.    F.M. does not speak or read English. John Harris's and Colony Ridge Defendants' salespersons, Sandra and Eduardo, filled out F.M.'s loan application and informed her that a shorter loan term would be "more expensive." John Harris's and Colony Ridge Defendants' salespersons did not explain the difference in interest rates based on the different loan terms.

172.    Based on John Harris's and Colony Ridge Defendants' salespersons' advice, FM decided to finance the loan for a longer term.

173.    As noted above, F.M. does not speak or read English. At closing, John Harris's and Colony Ridge Defendants' salespersons failed to explain each page of the financing and closing documents to F.M. Instead, John Harris's and Colony Ridge Defendants' salespersons rushed F.M. through the sales process and only explained to F.M. where she had to sign.

174.    These salespersons also told F.M. there was no flooding in the subdivision, but since purchasing the lot, F.M. has found that the lot routinely floods. In fact, the flooding occurs with little rain and often causes more than half the lot to be under water.

**9)  Consumer P.C. (Example Transaction No. 9):**

175.    On or about January 28, 2021, consumer P.C. purchased and financed a lot from John Harris and Colony Ridge Defendants in the Santa Fe subdivision of Colony Ridge for approximately $58,300 at an interest rate of 12.9% for 20 years.

176.    P.C. speaks and reads limited English. At closing, John Harris's and Colony Ridge Defendants' notary failed to explain each page of the financing and closing documents to P.C. in detail. Instead, John Harris's and Colony Ridge Defendants' notary rushed P.C. through the sales process and only explained to P.C. where she had to sign.

177.    The notary informed P.C. that the lot "was ready with services" and did not provide P.C. with an estimate cost for utility connections at the time of sale.

178.    At the time of sale, John Harris's and Colony Ridge Defendants' notary, Hector, stated that Colony Ridge Defendants had performed an "analysis" and there was no flooding in the subdivision.

179.    After purchasing the lot, P.C. soon discovered that there is constant flooding that occurs in the area of the lot she purchased. In fact, the flooding is so significant that P.C. is often stranded on the lot if the rain lasts for more than a short period of time.

**10) Consumers L.T. and L.J.T (Example Transaction No. 10):**

180.    On or about May 23, 2015, consumer L.J.T. (L.T's wife) purchased and financed a lot from John Harris and Colony Ridge Defendants in the Camino Real subdivision of Colony Ridge for approximately $ 25,000.

181.     During the sales process, John Harris's and Colony Ridge Defendants' salespersons informed L.J.T. and L.T. that the utilities were included with the lot and that all they would need to do was call the utility companies to set up the services.

182.     After the transaction, L.J.T. and L.T. discovered that they would need to pay over $5,000 to install a transformer and a water meter to be able to access basic utilities. This was not disclosed to L.J.T. or L.T. by John Harris's and Colony Ridge Defendants' salespersons during the sales process.

183.     Due to these unforeseen and undisclosed expenses, L.J.T. an L.T. have been unable to move onto the lot they purchased from John Harris and Colony Ridge Defendants nearly a decade ago.

184.     Despite not being able to move onto the lot, L.J.T. and L.T. have continued to submit their loan payments to Colony Ridge Defendants on a timely basis.

185.     Despite L.J.T.'s and L.T.'s timely payments to Colony Ridge Defendants, in or about 2018, Colony Ridge Defendants unlawfully foreclosed on L.J.T.'s lot without providing any notice to L.J.T. or L.T.

186.     LJ.T. and L.T. discovered that Colony Ridge Defendants had unlawfully foreclosed on their lot only after reviewing their property records.

187.     L.J.T. and L.T. were forced to retain an attorney to address Colony Ridge Defendants' unlawful foreclosure. Colony Ridge Defendants acknowledged that the unlawful foreclosure was "an issue on their end" only after L.J.T. and L.T. retained an attorney.

188.     On April 11, 2022, a Correction Instrument was recorded in the real property records of Liberty County, Texas which verified that L.J.T. was "in fact current on her mortgage payments and in full compliance with all of her obligations under the Deed of Trust."

**11) Additional Consumers Harmed by Defendants' Unlawful Business
     Practices:**

189.    As described above, discovery has not begun in this matter and the above-referenced examples do not represent an exhaustive list of all consumers who have been misled and deceived by Defendants' unlawful business practices.

190.    Upon information and belief, there are thousands of additional consumers who have been harmed by Defendants' unlawful business practices, which date back to at least 2015.

## COUNT 1

## VIOLATIONS OF THE DTPA

191.    The State incorporates and adopts by reference the allegations contained in each and every preceding paragraph of this Complaint.

192.    DTPA § 17.45(1) defines the term "goods" to mean "tangible chattels or real property purchased or leased for use." Defendants provided goods to consumers in the State of Texas, as that term is defined by DTPA § 17.45(1).

193.    DTPA § 17.45(2) defines the term "services" to mean "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Defendants provided services to consumers in the State of Texas, as that term is defined by DTPA § 17.45(2).

194.    DTPA § 17.45(4) defines the term "consumer" to mean an individual, partnership, corporation, the State of Texas, or a subdivision or agency of the State of Texas who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more."

195.   The "consumers" referenced in this Complaint are "consumers" as defined by the DTPA because they sought or acquired, by purchase or lease, goods or services from one or more Defendants, and are neither business consumers with assets of $25 million or more nor are they owned or controlled by any entity.

196.   DTPA § 17.45(6) defines "trade" and "commerce" to mean:

the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.

197.   All Defendants and their agents have, at all times as described in the preceding and proceeding paragraphs, engaged in "trade" and "commerce" in the State of Texas, as those terms are defined by DTPA § 17.45(6).

198.   Defendants, as alleged and detailed above, and in the course of trade and commerce, have engaged in false, misleading, and deceptive acts and practices declared unlawful in § 17.46(a) and (b) of the DTPA.

199.   The Office of the Texas Attorney General's Consumer Protection Division may bring an action in the name of the State to restrain a defendant from engaging in acts or practices declared to be unlawful by the DTPA. DTPA § 17.47(a); *see also* DTPA § 17.46(a) ("False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division").

200.   In violation of DTPA § 17.46(a), Defendants have engaged in the following false, misleading, or deceptive acts or practices:

(a) Colony Ridge, at the direction of John Harris, conducted rushed closings where paperwork (including, the Land Purchase Agreements and all other transaction

51

documents) was neither translated nor adequately explained to consumers, including Spanish-speaking consumers.

(b) All violations of DTPA § 17.46(b) subsections enumerated *below* are also violations of DTPA § 17.46(a).

201.   In violation of DTPA § 17.46(b)(1), Colony Ridge has falsely, expressly or by implication, passed off goods or services as those of another, in violation of the DTPA by:

(a) advertising and listing lots for sale by individuals who do not exist and/or who had no ownership or ability to sell said lots. Colony Ridge created the impression that these fictitious sellers were selling the lots in their individual capacity rather than on behalf of Colony Ridge.

202.   In violation of DTPA § 17.46(b)(2), Defendants have caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services:

(a) Colony Ridge caused confusion or misunderstanding as to the source of real estate by advertising and listing lots for sale by individuals who do not exist and/or who had no ownership or ability to sell said lots.

(b) As alleged in detail in Paragraphs 18-29 and 102-113, John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, El Norte POA, and CH&P represented that lots sold to consumers included services provided by POAs which one or more Defendants terminated.

203.   In violation of DTPA § 17.46(b)(5), Defendants have represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not:

(a) Colony Ridge advertised and represented (verbally and/or in writing) that the lots for sale: were move in ready; were ready to build; included all city services and/or culvert(s); and/or that the city services were easily accessible, when in fact consumers have been required to install and/or connect city services and culvert(s) at great expense.

(b) Colony Ridge advertised and represented (verbally and/or in writing) that lot sales were owner-financed, when in reality Colony Ridge was the seller.

(c) Colony Ridge advertised and misrepresented (verbally and/or in writing) the estimated costs and/or fees associated with the connection and/or installation of city services and/or culvert(s) to the lots.

(d) Colony Ridge advertised and misrepresented (verbally and/or in writing) the date by which the lots would be ready for the consumers to build a structure on and/or otherwise occupy.

(e) Colony Ridge misrepresented (verbally and/or in writing) the tendency of lots to flood.

(f) Colony Ridge and John Harris falsely represented in Land Purchase Agreements (and other transaction documents) that the purchase consisted of not just legal title (or ownership) of the lots, but also property that is available for consumers to immediately begin occupying and/or begin developing.

(g) As alleged in Paragraph 86, Colony Ridge inaccurately informed consumers (verbally and/or in writing) that Colony Ridge would accept "returns" of lots which they had sold to consumers.

(h) Colony Ridge and John Harris falsely represented in Land Purchase Agreements (and other transaction documents) that the property taxes associated with the purchase would be prorated.

(i) As alleged in detail in Paragraphs 18-29 and 102-113, John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, El Norte POA, and CH&P misrepresented the purposes, objectives, and benefits of the services provided to consumer-members of the POAs.

204.    In violation of DTPA § 17.46(b)(9), Defendants have advertised goods or services with the intent not to sell them as advertised:

(a) Colony Ridge advertised and represented to consumers (verbally and/or in writing) that the lots for sale were: move in ready; ready to build; included all city services and/or culvert(s); and/or that the city services were easily accessible, when in fact Colony Ridge knew or had reason to know—based on the thousands of transactions Colony Ridge has executed with consumers since at least 2015—that the lots are not move in ready, are not ready for the consumers to build a structure on, do not include all city services and/or culvers, and are not cheaply or easily accessible.

(b) Colony Ridge advertised and misrepresented to consumers (verbally and/or in writing) the estimated costs and/or fees associated with the connection and/or installation of city services and/or culvert(s) to the lots, when in fact Colony Ridge knew or had reason to know—based on the thousands of transactions Colony Ridge has executed with consumers since at least 2015—that consumers would be responsible for spending thousands (even tens of thousands) of dollars for the costs and/or fees associated with these connections and/or installations.

(c) Colony Ridge advertised and misrepresented (verbally and/or in writing) the date by which the lots would be ready for the consumers to build a structure on and/or otherwise occupy, when in fact Colony Ridge knew or had reason to know—based on the thousands of transactions Colony Ridge has executed with consumers since at least 2015—that consumers would not be able to begin occupying and/or otherwise developing the lot for several years after closing.

(d) Colony Ridge advertised and listed lots for sale that it did not intend to sell as advertised because the advertisements and listings were made by individuals who do not exist and/or who had no ownership or ability to sell said lots. As described above, Colony Ridge created the impression that these fictious sellers were selling lots in their individual capacity rather than on behalf of Colony Ridge.

(e) As alleged in detail in Paragraphs 18-29 and 102-113, John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, El Norte POA, and CH&P falsely advertised, without intent to provide as advertised, the services of El Norte POA and POAs which one or more Defendants terminated.

205.    In violation of DTPA § 17.46(b)(12), Defendants have falsely, expressly or by implication, represented that agreements confer or involve rights, remedies, or obligations which they do not have or involve, or which are prohibited by law:

(a) Colony Ridge and John Harris falsely, expressly or by implication, represented to consumers in the Land Purchase Agreements (and other transaction documents) that consumers could immediately begin occupying and/or begin developing the lots at closing.

(b) Colony Ridge and John Harris falsely, expressly or by implication, provided to consumers Land Purchase Agreements (and other transaction documents), instruments which misrepresented to consumers that the contract waived specific rights, when such rights cannot be waived by law.

(c) Colony Ridge and John Harris falsely, expressly or by implication, represented in the Land Purchase Agreements (and other transaction documents) that consumers would only have to pay prorated property taxes for the year of purchase, when, in reality, the legally-binding deeds specified consumers must pay the entire years' worth of taxes.

(d) As alleged in detail in Paragraphs 18-29 and 102-113, John Harris, T-Rex, CR Development, CR Bella Vista, CR Land, El Norte POA, and CH&P falsely, expressly or by implication, represented that agreements and covenants to which POA members were or would be bound, conferred or involved rights, remedies, or obligations which the agreements and covenants did not have, or which were prohibited by law.

## COUNT 2

### FRAUD IN REAL ESTATE TRANSACTIONS

### (AGAINST COLONY RIDGE, INC.; COLONY RIDGE DEVELOPMENT, LLC; COLONY RIDGE LAND, LLC; T-REX MANAGEMENT, INC.; COLONY RIDGE BV, LLC; AND JOHN HARRIS)

206.    The State incorporates and adopts by reference the allegations contained in each and every preceding paragraph of this Complaint.

207.    Texas Business and Commerce Code, § 27.01 prohibits fraud in real estate transactions. The statute applies to any fraud in a transaction involving real estate and consists of:

56

(1) false representation of a past or existing material fact, when the false representation is (a) made to a person for the purpose of inducing that person to enter into a contract; and (b) relied on by that person in entering into that contract; or (2) false promise to do an act, when the false promise is (a) material; (b) made with the intention of not fulfilling it; (c) made to a person for the purpose of inducing that person to enter into a contract; and (d) relied on by that person in entering into that contract. Tex. Bus. & Com. Code § 27.01(a).

208.    Pursuant to Texas Business and Commerce Code § 27.015, a violation of § 27.01 of the Texas Business and Commerce Code that relates to the transfer of title to real estate is a false, misleading, or deceptive act or practice, as defined by § 17.46(b) of the DTPA, and any public remedy under Subchapter E, Chapter 17, is available for a violation of § 27.01 of the Texas Business and Commerce Code.

209.    Colony Ridge and John Harris violated § 27.01(a)(1) of the Texas Business and Commerce Code by making false representations of past or existing material facts in transactions involving real estate to consumers in Texas.

210.    Specifically, Colony Ridge and John Harris represented to some consumers that city services were available at lots as a means of inducing consumers to purchase a lot to build a home. However, many lots purchased by consumers lacked the necessary infrastructure for a consumer to build a home. Consumers become aware of this fact after all contracts have been signed and they have no ability to revoke the real estate transaction.

211.    On those real estate transactions where Colony Ridge and John Harris actually informed consumers that the lot did not have city services, Colony Ridge and John Harris represented to those consumers that the cost to install the city services would be minimal, *i.e.,* a

few hundred dollars. Consumers were induced to purchase a lot based on this representation only to discover that the cost to install city services was in the thousands of dollars.

212.     Colony Ridge and John Harris's false representations to consumers were made for the purpose of inducing those consumers to enter into contracts, and the false representations were relied on by consumers in entering into those real estate contracts.

213.     Colony Ridge and John Harris also violated § 27.01(a)(2) of the Texas Business and Commerce Code when they promised consumers that the necessary infrastructure would be available for the purchased lot by a certain date, but they had no intention of fulfilling this obligation within the stated time period. This promise was made for the sole purpose of inducing a consumer to purchase a lot.

214.     Consumers relied on Colony Ridge and John Harris's promise that the necessary infrastructure would be in place by a certain date when purchasing the lot. Instead, some consumers had to wait years beyond their closing date before they could access the lot to build a home.

215.     Colony Ridge and John Harris made the above-referenced false representations and promises to consumers with actual awareness of their falsity.

216.     Colony Ridge and John Harris failed to disclose the falsity of the representations and promises to these consumers.

217.     Colony Ridge and John Harris have benefited financially from the false representations and promises made to consumers.

## COUNT 3

## CFPA VIOLATIONS (DECEPTIVE ACTS OR PRACTICES)

### (AGAINST COLONY RIDGE LAND, LLC; JOHN HARRIS; COLONY RIDGE DEVELOPMENT, LLC; COLONY RIDGE BV, LLC; AND T-REX MANAGEMENT, INC.)

218.    The State incorporates and adopts by reference the allegations contained in each and every preceding paragraph of this Complaint.

219.    The CFPA, which prohibits "unfair, deceptive or abusive acts or practices," explicitly delegates to state attorneys general the authority to bring Federal civil enforcement actions in order to enforce the CFPA and to secure remedies provided therein. *See* 12 U.S.C. § 5552(a)(1). This provision is subject to a requirement that a state attorney general provide prior notice to the Consumer Financial Protection Bureau before filing suit. The State has provided such notice.

220.    The CFPA prohibits "any covered person or service provider . . . [from engaging] in any unfair, deceptive, or abusive act or practice." *See* 12 U.S.C. § 5536(a)(1)(B).

221.    The CFPA defines a "covered person" to include any person that engages in offering or providing a consumer financial product or service, as well as any affiliate of such a covered person that also acts as a service provider to such covered person. *See* 12 U.S.C. § 5481(6)(A)-(B).

222.    The CFPA defines an "affiliate" as any person that controls, is controlled by, or is under common control with another person. *See* 12 U.S.C. § 5481(1).

223.    The CFPA defines a "service provider" as any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service. *See* 12 U.S.C. § 5481(26)(A).

224.    Under the CFPA, the term "related person" is deemed a covered person for purposes of any provision of Federal consumer financial law. *See* 12 U.S.C. § 5481(25)(B). The CFPA defines a "related person" as any director, officer, or employee charged with managerial

responsibility for, or controlling shareholder of, or agent for, such covered person. *See* 12 U.S.C. § 5481(25).

225.    CR Land is a covered person under the CFPA because it extends credit. *See* 12 U.S.C. § 5481(15)(A)-(i).

226.    John Harris is a covered person under the CFPA because he is an affiliate, service provider, and related person within the meaning of the CFPA. *See* 12 U.S.C. § 5481(1), 5481(6)(B), 5481(25), 5481(26)(A).

227.    CR Development, CR Bella Vista, and T-Rex are also covered persons because they are affiliates and service providers within the meaning of the CFPA. *See* 12 U.S.C. § 5481(1), 5481(6)(B), 5481(26)(A).

228.    As described above, in advertising, marketing, and offering seller-financing for residential lots, CR Land, CR Development, CR Bella Vista, T-Rex, and John Harris misrepresented, either expressly or by implication:

> (a) that the residential lots that CR Land finances are move in ready and/or include all city services and/or culvert(s), when in fact the consumer must spend thousands of dollars to connect and/or install said city services and/or culvert(s) to their residential lots;

> (b) the estimated costs and/or fees associated with the connection and/or installation of city services and/or culvert(s) to the residential lots; and

> (c) the date by which the residential lots will be ready for the consumer to build a structure on and/or otherwise occupy.

229.    In advertising, marketing, and offering seller-financing for residential lots, CR Land, CR Development, CR Bella Vista, T-Rex, and John Harris omitted key terms and conditions associated with the real estate transaction, including, *inter alia*:

> (a) that there are restrictions on most or all residential lots (including, restrictions imposed by the El Norte POA), which prevent consumers from immediately building a structure and/or otherwise occupying the residential lots;
>
> (b) the estimated costs and/or fees associated with the connection and/or installation of city services and/or culvert(s) to each residential lot; and
>
> (c) the actual date by which the residential lots will be ready for the consumer to build a structure on and/or otherwise occupy.

230.    CR Land, CR Development, CR Bella Vista, T-Rex, and John Harris's misrepresentations and omissions concerning the real estate transactions and loans at issue are material because they are likely to affect a consumer's ability to assess the *total* financial impact of the real estate transaction and associated loan.

231.    The above-described statements and omissions are likely to mislead a consumer acting reasonably under the circumstances.

232.    These representations and omissions, in light of the representations made, are deceptive omissions and deceptive acts or practices that violate §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT 4

## CFPA VIOLATIONS (ILSA VIOLATIONS)

## (AGAINST COLONY RIDGE DEVELOPMENT, COLONY RIDGE BV, AND JOHN HARRIS)

233.    The State incorporates and adopts by reference the allegations contained in each and every preceding paragraph of this Complaint.

234.    The State of Texas has authority to enforce the CFPA through violations of ILSA because the statute is an "enumerated consumer law" under the CFPA. *See* 12 U.S.C. §§ 5481(12)(R), 5481(14), 5552(a)(1). § 5552 of the CFPA authorizes states to bring CFPA claims not just for engaging in "unfair, deceptive, or abusive" conduct, but also against "covered persons" or "service providers" who offer or provide "to a consumer any financial product or service not in conformity with Federal consumer law, or otherwise commit an act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

235.    ILSA is a consumer protection statute enacted to protect consumers from developers selling undeveloped land. ILSA applies to the developer or agent "who directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease" any lot in a subdivision. 15 U.S.C. §§ 1701(5), (6).

236.    ILSA requires the developer to provide each consumer with a disclosure document called a Property Report that contains relevant information about the subdivision. This Property Report must be delivered before the consumer signs the contract. 15 U.S.C. § 1703(a)(1)(B)-(D). A Property Report is a detailed document that should include information about the risks of buying land; a statement on the general terms and conditions, including the range of selling prices of the lots in the subdivision; and information about the general topography of the subdivision, including whether the subdivision is included in a flood plain or subject to flooding and whether the lots require draining or fill prior to being used as a homesite. *See* 15 U.S.C. §§ 1707, 12 C.F.R. §§ 1010.107, 1010.115.

237.    ILSA also prohibits any developer or agent from misrepresenting a material fact regarding the lot, or misrepresenting that roads, sewers, water, gas, or electric service will be provided or completed by the developer without stipulating in the contract for sale that such services will be provided or completed. *See* 15 U.S.C. § 1703(a)(2)(A)-(D).

238.    The regulations define unlawful sales practices involving the sale of a lot under ILSA as: (1) giving a contract to a consumer encouraging them to sign before delivery of the Property Report; (2) failing to provide consumers with a Property Report; (3) using a note, contract, deed, or other document prepared in a language other than that in which the sales campaign is conducted, unless an accurate translation is provided; and (4) representing a lot as a homesite or building lot unless the lot is free from periodic flooding. *See* 12 C.F.R. §§ 1011.20(b),(c),(f),(i)(4), 15 U.S.C. § 1703(a)(1)(B).

239.    In addition, the regulations bar a developer from engaging in misleading sales practices. *See* 12 C.F.R. § 1011.25. Among the numerous misleading sales practices defined by the regulations, developers cannot represent "uses to which the offered land can be put unless the land can be put to such use without unreasonable cost to the purchaser and unless no fact or circumstance exists which would prohibit the immediate use of the land for its represented use." 12 C.F.R § 1011.25(c).

240.    Colony Ridge Development, Colony Ridge BV, and John Harris sold lots within the subdivisions of the Development that were not exempt under 15 U.S.C. § 1702.

241.    Colony Ridge Development, Colony Ridge BV, and John Harris, directly or indirectly, used means or instruments of communication in interstate commerce in the sale of lots. Specifically, Colony Ridge Development, Colony Ridge BV, and John Harris offered to sell lots within the Development on the internet and in telemarketing calls.

242.     Colony Ridge Development, Colony Ridge BV, and John Harris are subject to the requirements of ILSA and have violated the statute.

243.     Upon information and belief, Colony Ridge Development, Colony Ridge BV, and John Harris have not provided any consumer with the Property Report containing all required information before the consumer signs the contract for the purchase of the lot.

244.     As previously discussed, Colony Ridge Development, Colony Ridge BV, and John Harris conducted a large portion of their sales campaign in Spanish. This includes advertising on their websites, Facebook postings, YouTube videos, local publications, and ads within the Development's community.

245.     Colony Ridge Development, Colony Ridge BV, and John Harris violated ILSA by failing to provide non-English speakers with contracts or any other documents in any other language than English.

246.     The regulation requires an accurate translation of documents provided to the buyer. Colony Ridge Development, Colony Ridge BV, and John Harris only orally explain all documents provided to consumers and fail to provide an accurate translation of documents as required by the regulation. 12 C.F.R. § 1011.20(f).

247.     Colony Ridge Development, Colony Ridge BV, and John Harris also repeatedly represent lots as a homesite or building lot when the lots are not free from periodic flooding.

## CIVIL PENALTIES

248.     The State believes that after a reasonable opportunity for discovery, the evidence will likely show that Defendants knowingly violated a federal consumer financial law when it engaged in the acts and practices described herein. Accordingly, the State seeks the imposition of

third tier civil penalties up to One Million Dollars ($1,000,000) for each day during which such violation continues. *See* 12 U.S.C. §§ 5565(a)(2)(H), 5565(c)(1), 5565(c)(2)(C).

249.    DTPA § 17.47(c) and Texas Business and Commerce Code § 27.015 authorize the Office of the Texas Attorney General's Consumer Protection Division to request a civil penalty to be paid to the State of Texas in an amount of: (1) not more than $10,000 per violation; and (2) if the act or practice that is subject of the proceeding was calculated to acquire or deprive money or other property from a consumer who was 65 years of age or older when the act or practice occurred, an additional amount of not more than $250,000.

250.    Accordingly, the State requests that the Court award civil penalties against Defendant in this case, pursuant to DTPA §§ 17.47(c)(1) and (2), Texas Business and Commerce Code § 27.015.

## ATTORNEYS' FEES AND COSTS

251.    This action is brought pursuant to DTPA §§ 17.41, *et seq.*, Texas Business and Commerce Code § 27.01, and Consumer Financial Protection Act 12 U.S.C. § 5565, under which injunctive relief, civil penalties, attorneys' fees, and costs of court are recoverable by the Office of the Texas Attorney General.

252.    Accordingly, the State seeks to recover attorneys' fees and costs of court for the prosecution of this injunctive enforcement action, as provided by Texas Government Code § 402.006(c).

## CONDITIONS PRECEDENT

253.    All conditions precedent to the State's claim for relief have been performed or have occurred.

**PRAYER FOR RELIEF**

254.     **WHEREFORE**, the State respectfully requests that this Honorable Court issue an

Order:

A.     Declaring Defendants' conduct as described herein above to be in violation of the
DTPA and CFPA.

B.     Permanently enjoining Defendants and all other persons acting on its behalf,
directly or indirectly, from violating the DTPA and CFPA, and any provision of
Federal consumer financial law, as defined by 12 U.S.C. § 5481(14), and any
amendments thereto;

C.     Permanently enjoining John Harris and Colony Ridge, their agents, employees, and
anyone acting in active concert or participation with them, from:

    i.     creating social media accounts impersonating those who have no relation to
said social media accounts;

    ii.     using false or misleading images within their social media accounts;

    iii.     falsely representing the location of lots within advertisements;

    iv.     advertising lots without the intention to sell the lots as advertised;

    v.     failing to provide accurate translations of documents in selling lots; and

    vi.     misrepresenting the condition of lots for sale.

D.     Permanently enjoining John Harris, T-Rex, CR Development, CR Bella Vista, CR
Land, El Norte POA, and CH&P, their agents, employees, and anyone acting in
active concert or participation with them, from:

    i.     Representing, directly or indirectly, that any POA that one or more
Defendants purported to have terminated exists;

ii. Representing or advertising, directly or indirectly, that membership to any POA includes services—or confers benefits, rights, or obligations—which such membership does not include or confer;

iii. Collecting on—or sending to any third party to collect on—any delinquent POA funds from any real property owner in any Colony Ridge subdivision, that have accrued at any time;

iv. Foreclosing on any lien on real property for unpaid amounts due to any Colony Ridge POA, if any such unpaid amounts accrued from the date El Norte POA was formed to the date the Court grants a Permanent Injunction, if any;

v. Transferring, moving, concealing, spending, or withdrawing funds derived from the transfer of any asset (including, but not limited to, real property assets) from any Colony Ridge POA, to one or more Defendants;

vi. Collecting any funds from POA members in any Colony Ridge subdivision, unless such funds are to be spent only for the benefit of the residents of that specific Colony Ridge subdivision; and

vii. Spending any funds collected from POA members in any Colony Ridge subdivision, unless such funds are spent only for the benefit of the residents of that specific Colony Ridge subdivision.

E. Directing the recission or reformation of contracts where necessary to redress injury to consumer borrowers;

F.      Directing Defendants to make full restitution to all consumers who have suffered losses as a result of the acts and practices alleged in this Complaint and any other acts or practices proved by the State, pursuant to DTPA § 17.47(d);

G.      Directing Defendants to award damages, restitution, equitable, and other monetary relief under 12 U.S.C. § 5565(a);

H.      Directing Defendants to pay the State appropriate civil penalties pursuant to the CFPA and the DTPA;

I.      Directing Defendants to pay the State's investigative and litigation costs in this matter; and

J.      Granting such other general, equitable, and/or further relief as the Court deems just and proper.

DATED: May 24, 2024

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

RYAN S. BAASCH
Chief for Consumer Protection Division

*s/ Richard Berlin*
RICHARD BERLIN
Attorney-in-Charge
Texas Bar No.: 24055161
Southern District of Texas Bar No.: 724520
Consumer Protection Division
Office of the Attorney General
808 Travis Street, Suite 1520

Houston, Texas 77002
Telephone: 713-223-5886
Fax: 713-223-5821
Email: rick.berlin@oag.texas.gov

DANIEL ZWART
Texas Bar No.: 24070906
Southern District of Texas Bar No.: 1086296
daniel.zwart@oag.texas.gov

KAYLIE BUETTNER
Texas Bar No.: 24109082
Southern District of Texas Bar No.: 3748037
kaylie.buettner@oag.texas.gov

MEREDITH SPILLANE
Texas Bar No.: 24131685
Southern District of Texas Bar No.: 3865437
meredith.spillane@oag.texas.gov

GABRIELA I. MARTINEZ
Texas Bar No.: 24085454
Southern District of Texas Bar No.: 3866164
gabriela.martinez@oag.texas.gov

NORMAN R. CAHN
Texas Bar No.: 24125161
Southern District of Texas Bar No.: 3867272
norman.cahn@oag.texas.gov

MONICA F. RAMIREZ
Texas Bar No.: 24068621
Southern District of Texas Bar No.: 2618697
monica.ramirez@oag.texas.gov

JASON MCKENNEY
Texas Bar No.: 24070245
Southern District of Texas Bar No.: 3866898
jason.mckenney@oag.texas.gov

Assistant Attorneys General
Consumer Protection Division
Office of the Attorney General
808 Travis Street, Suite 1520
Houston, Texas 77002
Telephone: 713-223-5886

Fax: 713-223-5821

**ATTORNEYS FOR PLAINTIFF,**
**STATE OF TEXAS**


**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on May 24, 2024, a true and correct copy of the foregoing of this document was served using the Court's electronic filing system to the following:

| | |
|---|---|
| Quentin Tate Williams | Judd E. Stone II |
| Attorney-in-Charge | Christopher D. Hilton |
| Philip Harlan Hilder | Ari Cuenin |
| James Gregory Rytting | Cody C. Coll |
| Stephanie K. McGuire | Stone Hilton PLLC |
| Hilder & Associates, P.C. | 1115 W. Slaughter Ln. |
| 819 Lovett Blvd. | Austin, TX 78748 |
| Houston, TX 77006 | Tel.: (737) 465-3897 |
| Tel.: (713) 655-9111 | Email: judd@stonehilton.com |
| Fax: (713) 655-9112 | chris@stonehilton.com |
| Email: tate@hilderlaw.com | ari@stonehilton.com |
| philip@hilderlaw.com | cody@stonehilton.com |
| james@hilderlaw.com | |
| stephanie@hilderlaw.com | |

Jason Derot Ray
Riggs & Ray, P.C.
3307 Northland Dr., Suite 215
Austin, TX 78731
Tel.: (512) 457-9806
Fax: (512) 457-9066
Email: jray@r-alaw.com


*s/ Richard Berlin*
RICHARD BERLIN